NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

FLORIDA MEDICAL CENTER, INC., d/b/a Lauderdale Lakes General Hospital, Respondent.

No. 77–2538.

United States Court of Appeals, Fifth Circuit.

July 17, 1978.

Elliott Moore, Deputy Associate Gen. Counsel, Michael Winer, Supervisor, Anne Andrews, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl Taylor, Associate Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner.

James S. Bramnick, Miami, Fla., for respondent.

Before BROWN, Chief Judge, and THORNBERRY and CLARK, Circuit Judges.

THORNBERRY, Circuit Judge:

This is a complicated and acrimonious dispute arising out of an employee attempt to introduce unionization into a hospital. Pursuant to section 10(e) of the National Labor Relations Act, the petitioner N.L.R.B. seeks to enforce its order finding that respondent Florida Medical Center, which did business as Lauderdale Lakes General Hospital, violated sections 8(a)(1) and (3) of the Act by maintaining and enforcing an overbroad no solicitation rule, threatening employees with reprisal for union activities, and discharging certain employees because of their protected, concerted union activities.

Lauderdale Lakes General Hospital is a 287-bed proprietary facility. In 1974 the hospital hired Bridget Kelly as a graduate nurse. Kelly alleged that when hired she was told that she would receive an automatic wage increase at six months and at one year of employment. Although Kelly received a twenty cent an hour raise when her status changed to registered nurse, she did not receive the expected raise at the end of six months. In September the hospital posted a notice that wage increases would be given on a merit basis. Conclud-

ing that she would not receive the automatic raise promised her, Kelly initiated a petition in the form of a letter addressed to the Chief Administrative Officer of the hospital, Dr. Dauer. Kelly circulated the petition in the hospital and gained approximately seventy-five signatures. At one point Kelly showed the petition to the director of nursing services. She also told the director that she had initiated the petition because of the change in wage policy. Although the director declined to read the petition, she knew of its contents from Kelly's explanation. She asked Kelly to stop circulating the petition and proceed through the hospital grievance committee. Kelly was given permission to circulate the petition in the cafeteria and coffee shop only if she would remove her nurses' cap. She circulated the petition in the cafeteria. After she was off duty she returned to the hospital to solicit employees who were clocking out. She was asked to leave, but continued to solicit employees outside of the hospital. The petition was never actually presented to Dr. Dauer.

In October Kelly contacted the Seafarers Union in New York and invited some fellow employees to her home for a meeting with union representatives. Six employees were present and signed union authorization cards. One employee, Carolyn Stern, took some union cards for distribution. Kelly alleged that in mid-October Dr. Dauer told her that she was "playing with dynamite" and that he could have narcotics placed in her car at any time. In late October Kelly was called into a counseling session with two supervisors. The two counselors gave Kelly a form which recommended a fifteen day probationary period on the ground that her attitude was poor. Kelly accused the supervisors of counseling her on orders from Dr. Dauer after one supervisor suggested that her change in attitude resulted from her union involvement. During a further heated exchange she referred to Dr. Dauer as a "Mafia director." The supervisors prepared a memorandum of the interview and sent it to an associate administrator who gave it to Dr. Dauer. The hospital claimed that Dr. Dauer was asked whether

the charge was true and vigorously denied it. Two days later Kelly was called into Dauer's office, charged with making the "Mafia" remark and summarily fired. A hospital employee escorted her to collect her belongings and then out of the building. Kelly claimed that she was concerned because she had not been able to complete her narcotics entries before she left the building and that she remained in the hospital parking lot to request that another employee re-enter the building and complete the report. Two hospital administrators came into the parking lot and told her to leave. She refused. The administrators called the police, who arrested Kelly. She was taken to the police station, charged with trespassing, and photographed. The charges were eventually dropped.

Carolyn Stern, who worked in the hospital as a phlebotomist, was also discharged and claimed that the discharge resulted from her union activity. Stern's early record at the hospital was good. She came to work in 1973. She had received a merit raise and a recommendation from one of the doctors at the hospital in connection with a community college application. Stern attended the first union meeting at Kelly's home. Thereafter she passed out authorization cards in the hospital. A supervisor told her that she could not pass out union cards at work. She was reprimanded for discussing the union at the hospital and telling other employees to call her at home for more information. The reprimand took place on October 18. From October to February, Stern's union activity continued without incident. In February she was terminated in an incident involving insult to a patient. The patient had become abusive when Stern could not find a vein from which to draw blood. Stern had responded that the patient needed to lose weight, implying that his obesity rather than her ineptitude was the cause of the problem.

The Board found that the hospital had violated sections 8(a)(1) and (3) by maintaining and enforcing an overbroad no solicitation rule, threatening employees and discharging Kelly and Stern. It ordered the

hospital to cease and desist from the enforcement of its no solicitation rule and to reinstate Kelly and Stern with back pay. On appeal, the hospital argues that none of those decisions is supported by substantial evidence.

### The No Solicitation Rule

■ The hospital's no solicitation rule, contained in section c(7) of its Employee's Manual stated:

Employee solicitation of any kind, the collection of funds, group congregating or participating in activity of other than hospital business shall not be carried out on hospital time or property without special permission of the hospital administrator. Hospital time is defined to mean those hours when an employee is paid to work. EXAMPLE: An off-duty employee can only solicit another off-duty employee.

The hospital employer argues first that the no solicitation rule must be interpreted to cover only solicitation during actual working time and in a working area. We disagree. Facially, the rule applies to the hours when an employee is "paid to work" and to all hospital property. The average hospital employee might reasonably interpret the rule to cover non-working time such as rest periods and coffee breaks. *Florida Steel Corporation v. N. L. R. B.*, 529 F.2d 1225,

1230–31 (5 Cir. 1976).[1] With regard to the time during which employees might engage in solicitation, the rule was inherently ambiguous and we construe that ambiguity against the employer. The rule also applied facially to all hospital property. The record indicates that Kelly was permitted to solicit in the cafeteria and coffee shop, but not in the hallway where other employees were clocking out. On the record before us we conclude that these differences were not the result of any hospital policy designed to protect patients from distressing circumstances, but were the result of *ad hoc* application of the rule by individual supervisors. We think that the facial ambiguity of the rule taken together with the evidence that it was enforced only against the union and that it did not reflect a coherent hospital policy of protection for patients permit a finding that the rule was overbroad.[2] *N. L. R. B. v. Central Power & Light Company*, 425 F.2d 1318, 1323 (5 Cir. 1970). We do not disregard the concerns evident in *St. John's Hospital* and *Beth Israel* by holding this rule overbroad. The hospital is free to restrict solicitation through a rule that impinges employee's organizational rights only insofar as necessary to insure patient welfare. We only hold today that the rule in the present case reflects no such concern and that its breadth and ambiguity must cause it to fall. We therefore enforce the

---

**1.** Although an employee is "paid to work" during lunch breaks and rest periods, this time is considered non-working time during which an employer may not impose a nonsolicitation rule. *N. L. R. B. v. Mueller Brass*, 501 F.2d 680 (5 Cir. 1974); *N. L. R. B. v. Monarch Tool Co.*, 210 F.2d 183 (6 Cir.), *cert. denied*, 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1109 (1954).

**2.** The hospital also argued that a special circumstances exception to the general prohibition against broad no solicitation rules was warranted in its case. We recognize that the intermingling of patients and employees in patient access areas within a hospital is generally considered a special circumstance that operates to dispel a presumption of illegality associated with restrictions on solicitations. *St. John's Hospital & School of Nursing v. N. L. R. B.*, 557 F.2d 1368 (10 Cir. 1977); *N. L. R. B. v. Beth Israel Hospital*, 554 F.2d 477 (1st Cir.) *aff'd*, —— U.S. ——, 98 S.Ct. 2463, 57 L.Ed.2d 370, (1978). Recent cases involving no solicitation rules in a hospital context have focused upon whether or not union solicitation should be permitted in areas that are not strictly for patient treatment but to which patients do have access. Clearly the needs of hospital patients should be afforded considerable weight in striking the appropriate balance between the undisputed right of the hospital employees to engage in union activity and the duty of the hospital to maintain its services without disruption of patient care. Unlike the rules in *St. John's Hospital, supra,* or *Beth Israel, supra,* the rule in the present case gives no weight at all to the interests of employees. It simply bans solicitation on hospital property and during the time employees are paid to work without regard to whether the areas or times involved may be harmful to patients. The hospital may not arm itself with such a blunderbus and expect the Board or the court to narrow its aim.

cease and desist order of the Board with respect to the no solicitation rule.

### The Threat to Bridget Kelly

Dr. Dauer's alleged threat to Bridget Kelly occurred under the following circumstances. Kelly had gone to the telephone switchboard to ask the operator to call in a food order for the night shift. John Ralik, a maintenance engineer at the hospital, was also present in the switchboard area. The switchboard room had two doors opposite each other. Kelly was standing in one of the doors, holding a Manila envelope containing reading materials and cigarettes. Dr. Dauer appeared in the opposite door and announced to the three employees that because of thefts he had moved the pharmacy materials to the doctors' lounge. He asked that the employees watch out for suspicious activity and told them that he had hired an undercover agent to work in the hospital. Dauer, either by word or gesture, appeared to be interested in the envelope Kelly was carrying. She asked whether he wanted to see the contents. At this point Dauer made the crucial remark, "Miss Kelly, you're playing with dynamite." Kelly attempted to follow up the statement, but Dauer told her that if she wished to talk, she would have to come into his office. When she did as requested, he allegedly threatened to have narcotics placed in her car or on her person.

Kelly, Ralick, the switchboard operator, and Dauer all testified at the administrative hearing. The ALJ found that the testimony of Kelly, Ralick and the switchboard operator was corroborative on essential points. Ralick, however, had given a pretrial affidavit stating that Kelly had not followed Dauer out of the switchboard room. At the hearing he testified that Kelly did follow Dauer. The ALJ ruled that Ralick's hearing testimony should be credited over his affidavit because it was corroborated by that of the switchboard operator (which Ralick did not hear) and because Ralick, who had left the hospital on friendly terms after giving the affidavit, was now a disinterested party. The ALJ admitted testimony that when Kelly came out of Dauer's office, she exclaimed to Ralick in an excited manner that Dauer had just threatened to place narcotics on her person or in her car. He also found that Kelly's testimony and Ralick's hearing testimony were simply more credible than Dauer's hearing testimony.

We view the issue in this portion of the case solely as one of credibility. If Dr. Dauer made the statement alleged by Kelly, there is no question that it was a threat that amounted to a violation of section 8(a)(1) of the Act. Indeed, we cannot imagine a more coercive statement. A court of appeals is generally bound to accept the credibility choices of an administrative law judge as adopted by the National Labor Relations Board. *N. L. R. B. v. Imperial Bedding Co.*, 519 F.2d 1073 (5 Cir. 1975); *N. L. R. B. v. Bogart Sportswear Mfg. Co., Inc.*, 485 F.2d 1203 (5 Cir. 1973); *Bob's Casing Crews, Inc. v. N. L. R. B.*, 458 F.2d 1301 (5 Cir. 1972). Nothing in the record of this case convinces us that the rule should not be applied here. When the issue is simply one of believability, we will not overturn the decision of the ALJ, who had the opportunity to hear the testimony and view the witnesses, unless his findings are self-contradictory. *See Helena Laboratories Corp. v. N. L. R. B.*, 557 F.2d 1183 (5 Cir. 1977). We find that the record contains substantial evidence to support the Board's finding that the threat to Kelly occurred and that it was a violation of section 8(a)(1) of the Act.

### The Discharge of Bridget Kelly

The Board found that Kelly was threatened and then unlawfully discharged in contravention of sections 8(a)(1) and (3) of the Act. It ordered that she be reinstated and made whole through back pay. The hospital employer challenges that determination. It argues that Kelly was discharged for good cause and relies specifically upon the incident in which Kelly blurted out that Dr. Dauer was "a Mafia director." We find no substance to the hospital's complaints and hold that substantial evidence supports the Board's findings of section 8(a)(1) and (3) violations.

■ Section 8(a)(3) prohibits discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership ·in any labor organization. 29 U.S.C. § 158(a)(3). Because section 8(a)(3) requires that the prohibited conduct be for the purpose of discouraging union membership, employer motive is dispositive. *N. L. R. B. v. Great Dane Trailers, Inc.*, 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967). We think that the record in this case establishes union animus on the part of the employer at the time that Kelly was fired and that there was a causal connection between the employer's anti-union motivation and Kelly's discharge. *N. L. R. B. v. Houston Distribution Company*, 573 F.2d 260 (5 Cir. 1978); *Federal-Mogul Corporation v. N. L. R. B.*, 566 F.2d 1245 (5 Cir. 1978) (concurring opinion); *N. L. R. B. v. O. A. Fuller Supermarkets, Inc.*, 374 F.2d 197 (5 Cir. 1967). The hospital makes some allegations that Kelly's work performance suffered during the time of the organization campaign, but its primary theory is that the insulting language was just cause for discharge. Neither the deterioration argument nor the insulting language argument is persuasive. The specific complaint about Kelly's work performance was that she displayed a "poor attitude." The ALJ found as a fact that during the evaluation interview which resulted in the "Mafia director" statement, a supervisor asked Kelly why her attitude had changed and whether or not the change was related to the union. The hospital may not rely upon allegations of poor work attitude in the face of a record that demonstrates that poor attitude and union participation were, in its view, synonymous. *Cf. LTV Electrosystems, Inc. v. N. L. R. B.*, 408 F.2d 1122 (4 Cir. 1969).

Moreover we think that the employer's given reason for Kelly's discharge was patently pretextual. Although the hospital had every right to evaluate Kelly's performance, it could not use her pro-union sentiment as a basis for down-grading her work abilities. Spurred on by the ·notion that it was doing so, Kelly made the statement that Dr. Dauer was a "Mafia director." We agree with the ALJ that no reasonable person could have taken this charge seriously. The speed with which the charge was carried to Dauer himself and his summary dismissal of Kelly indicate to us that the hospital was lying in wait for the slightest false step on Kelly's part. *See N. L. R. B. v. Central Power & Light*, 425 F.2d 1318 (5 Cir. 1970). We are convinced that the employer's reasons given for Kelly's discharge are pretextual and that the Board's determination that section 8(a)(3) was violated is supported by substantial evidence.

■ A violation of section 8(a)(1) does not depend upon a finding of discriminatory motive. Section 8(a)(1) prohibits an employer from interfering with, restraining, or coercing employees in the exercise of rights guaranteed in section 7 of the Act. 29 U.S.C. § 158(a)(1). Section 7 gives employees the right to:

> [S]elf organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.

If an employee is engaging in concerted activities for the purpose of mutual aid and protection, the imposition of a disciplinary sanction for insubordination may violate section 8(a)(1) whether or not the employer has exhibited union animus. *Crown Central Petroleum Corporation v. N. L. R. B.*, 430 F.2d 724 (5 Cir. 1970). As long as the activities engaged in are lawful and the character of the conduct is not indefensible in its context, employees are protected by section 7 of the Act. *Id.* at 731.[3]

3. We have held that employees involved in grievance meetings may not be discharged for the use of allegedly abusive and insubordinate language. *Crown Central Petroleum Corporation, supra.* In *Crown Central* two employees had refused to work overtime because they believed that the agreement between the union and the employer left the decision whether or not to work overtime to the individual employee. In a grievance meeting designed to work

The inquiry in insubordination cases under section 8(a)(1) thus focuses not on the intent of the employer but upon whether the employee was engaged in protected, concerted activity and whether or not her actions were indefensible under the circumstances. Assuming for the moment that concerted activity exists, the issue of indefensibility turns upon the distinctive facts of each case. *N. L. R. B. v. Leece-Neville Company*, 396 F.2d 773 (5 Cir. 1968). While we have not sanctioned insubordination involving vulgar and profane language spoken in the presence of other employees and constituting direct defiance to superior authority as well as a refusal to follow reasonable instructions, *N. L. R. B. v. Soft Water Laundry, Inc.*, 346 F.2d 930 (5 Cir. 1965), we have been substantially lenient with more private outbursts, particularly when we were able to conclude that the employee's acts were spontaneous and in some way provoked by the employer's prior conduct. *Compare N. L. R. B. v. Mueller Brass Co.*, 501 F.2d 680 (5 Cir. 1974), *with Boaz Spinning Company v. N. L. R. B.*, 395 F.2d 512 (5 Cir. 1968). *See also J. P. Stevens Co. v. N. L. R. B.*, 547 F.2d 792 (4 Cir. 1976) (distinguishing between spontaneous and pre-meditated actions).

Thus far we have assumed that Kelly was engaged in protected, concerted activity when the "Mafia director" incident occurred. Although her position was not so clear-cut as that of an individual participating in a recognized grievance procedure or actively soliciting for the union, we think that under the circumstances of this case the hospital cannot argue that she was not protected. Her remarks during the meeting, however absurd, were made in response to insinuations by supervisors that her union activity was responsible for deterioration in her performance as demonstrated by her poor attitude. To extend Kelly less protection under these circumstances would contravene the purposes of the Act. The argument for the leeway afforded the individuals in *Crown Central* and *Leece-Neville, supra*, is even stronger in the face of employer provocation.

Normally our agreement with the Board's findings that Kelly's discharge violated sections 8(a)(1) and (3) would mandate enforcement of the Board's order. In this case, however, an issue not contemplated by the parties and requiring initial scrutiny by the Board has arisen. Sometime after the Board's award but before the appeal was taken, Bridget Kelly died. The Board's brief for enforcement contains a footnote that reinstatement was not sought for that reason. Nothing in the record indicates whether or not the Board heard argument on the issue of whether the back pay award should stand.

■ When an employer has committed an unfair labor practice, the Board has broad discretion in fashioning remedies to require the employer to undo the effects of its unlawful conduct. *N. L. R. B. v. Bush Hog, Inc.*, 405 F.2d 755 (5 Cir. 1968); *N. L. R. B. v. Rutter-Rex Mfg. Co.*, 245 F.2d 594 (5 Cir. 1957); *N. L. R. B. v. Coats & Clark, Inc.*, 241 F.2d 556 (5 Cir. 1957). The powers exercised by the Board are, however, remedial rather than punitive. *N. L. R. B. v. Strong*, 393 U.S. 357, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969). They are designed to provide measures to make workers whole for losses suffered as a result of unfair labor practices and not as a punishment for errant employers. *Republic Steel Corporation v. N. L. R. B.*, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940).

out the dispute, one employee hotly asserted that the supervisor's statements were "damn lies." While we did not in any way condone the employee conduct, we held that the statements could not subject employees to discipline since their language was not so opprobrious as to carry them beyond the protection of the Act. In doing so we recognized that passions run high in labor disputes and that epithets and accusations are common place. *Crown Central, supra* at 731. In order to effectuate the intention of the Act that a grievance procedure be a free and frank debate between equally situated individuals, we gave some leeway for impulsive behavior, which did not to any appreciable extent, impinge upon an employer's right to maintain order and respect.

■ We do not mean to indicate that the enforcement of a back pay order in the case of an intervening death of an unlawfully discharged employee would necessarily be punitive action on the Board's part. We are concerned, however, that neither of the parties addressed the question of whether Bridget Kelly's remedy survived her death. *Cf. Robertson v. Wegmann, Executor of the Estate of Clay Shaw,* —— U.S. ——, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978); *N. L. R. B. v. Robert Haws Company,* 403 F.2d 979 (6 Cir. 1968). We think that the Board is entitled to resolve this issue in the first instance and we therefore remand the case to it for a determination of the applicable law and whether or not, under that law, Kelly's remedy survived her death.

### The Discharge of Carolyn Stern

Like Bridget Kelly, Carolyn Stern was active in the attempts to organize a union within the hospital. The record reflects that early in the organization attempt she was reprimanded for solicitation of other employees. The ALJ found, however, that unlike Kelly, Stern's discharge was not motivated by union animus and was for good cause. Two members of the Board disagreed and the Board subsequently overruled the ALJ. The ALJ relied upon the fact that Stern's supervisor had shown some dislike for her even prior to the advent of the union organization attempts, the fact that several months had passed between Stern's reprimand for solicitation and her firing during which she continued her union activity, and the fact that Stern was discharged for conduct which undeniably upset a patient. The Board, on the other hand, found that the hasty and one-sided investigation of the patient incident demonstrated that the discharge was at least in part motivated by union animus. Implicit in the Board's conclusion is a finding that the union animus shown by the employer was so strong that the lapse of time could not dissipate it or that the hospital employer merely showed more sophistication in waiting to rid itself of Stern than it did in its precipitate firing of Kelly.

■ When the National Labor Relations Board does not accept the findings of the administrative law judge, the Court of Appeals has an obligation to examine the evidence and findings of the Board more critically than it would if the Board and the ALJ were in agreement. *N. L. R. B. v. Tom Johnson, Inc.,* 378 F.2d 342 (9 Cir. 1967). When the Board's decision rests primarily upon a divergent view of evidentiary facts rather than a difference in overall judgment as to proper inferences to be drawn from largely undisputed evidence, the court must pay particular attention to the record. *American Federation of Television & Radio Artists v. N. L. R. B.,* 129 U.S.App.D.C. 399, 405, 395 F.2d 622, 628 (1968).

■ Although the decision is a close one, we find that in this case the Board's conclusion that Stern was fired because of anti-union motivation rather than for good cause must be overturned. The Board assumed that the intensity of the union animus shown at the outset of the organizational campaign was sufficient to carry the day, permitting it to hold Stern's discharge an unfair labor practice. We would be required to uphold the Board if this inference were supported by substantial evidence, even though we might reach the opposite conclusion. We are not, however, bound to look only at the evidence which, when viewed in isolation, supports the Board's findings. We must take into account contradictory evidence or evidence from which conflicting inferences could be drawn. *N. L. R. B. v. Borden Co.,* 392 F.2d 412 (5 Cir. 1968). While there is substantial evidence to support a finding of extreme union animus at the beginning of this episode, there is little if any evidence to support a theory that the fire had not burned down by the time of the Stern incident.

■ The firing of Stern is otherwise distinguishable from that of Kelly. The incident which precipitated Kelly's termination was entirely within the control of the hospital staff. Kelly's statement was heard only by staff professionals who simply could not have given it the credence that they later claimed. Stern, on the other hand, made statements to a patient who was obviously distressed by her insults. The hospital staff had no particular control over the

intractability of its patients and in no way could have been said to have provoked Stern's response as it provoked Kelly's. Finally, we view Stern's action as more than a minor breach of etiquette that the hospital eagerly seized upon. Patient care is the foremost professional obligation of all staff members. Although the punishment in this case was severe, we think that it was not entirely out of reason. We find that the Board's decision that Stern's discharge was the result of union animus is not supported by substantial evidence on the record as a whole, and we reverse the portion of the Board's order which granted her reinstatement and back pay.

The decision of the Board is ENFORCED with respect to its cease and desist order covering the no solicitation rule. The finding that the hospital threatened Bridget Kelly is ENFORCED. The Board's finding that Kelly was unlawfully discharged violating sections 8(a)(1) and (3) is ENFORCED, but the case is REMANDED to the Board for consideration of the issues on survival of the remedy. The Board's order of reinstatement and back pay for Carolyn Stern is REVERSED.