NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

DATAPOINT CORPORATION, Respondent.

No. 80–1067.

United States Court of Appeals, Fifth Circuit. Unit A

April 8, 1981.

---

Elliot Moore, Deputy Assoc. Gen. Counsel, Bernard P. Jeweler, Howard E. Perlstein, NLRB, Washington, D. C., for petitioner.

Soules & McCamish, Inc., Michael W. Fox, John N. McCamish, Jr., San Antonio, Tex., for respondent.

Before AINSWORTH, and SAM D. JOHNSON, Circuit Judges, and HUNTER *, District Judge.

AINSWORTH, Circuit Judge:

The National Labor Relations Board seeks enforcement of its order requiring Datapoint Corporation to reinstate former employee R. Bradley Clark with backpay and to restore all seniority rights lost as a result of his discharge. The Board, disagreeing with the conclusions of the Administrative Law Judge who heard the case, found that Clark was terminated for having engaged in concerted activities protected under Section 7 of the labor act, 29 U.S.C. § 157,[1] and thus held that Datapoint had violated Section 8(a)(1) of the act, 29 U.S.C. § 158(a)(1).[2] 246 N.L.R.B. No. 39 (1979). The company contends that the Administrative Law Judge correctly found that Clark had not been engaged in protected concerted activity, "but rather was discharged because of a series of temper displays indicating his inability to work with some of his fellow employees which culminated in an arrogant act of insubordination toward his immediate supervisor." Record on Appeal at 346. We agree that there was not substantial evidence to indicate that Clark was involved in concerted activity within the meaning of Section 7 and therefore deny enforcement of the Board's order.

*The Facts*

Datapoint Corporation, a manufacturer of computer systems, employs approximately 2300 workers at its San Antonio, Texas, plant. This case, however, involves only one of the approximately twenty-two production employees in the printing services department. On Friday, July 14, 1978, Mrs. Lois Jeane Davis, the manager of the department, met with the production employees and announced that the long-rumored move of the department to larger quarters was to take place during the first week of August. In addition to describing the new

---

* District Judge of the Western District of Louisiana, sitting by designation.

1. Section 7 provides, in pertinent part, that "[e]mployees shall have the right . . . to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157.

2. Section 8(a)(1) provides that "[i]t shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1).

location and answering questions about the facilities, Davis informed the employees that all but three of the employees would either have to use vacation time or take the week off without pay while the department was relocated. Clark, the operator of a high-speed photocopying machine used to print urgently needed items, was among the three who would not be laid off during the week of the move. After the meeting with Davis, the employees returned to work but continued to discuss the move and the layoff. At this time, Clark told other employees that the layoff was illegal and contrary to company policy. Word filtered back to Davis that "Brad [Clark] was rather loudly proclaiming all over the Printing Production area that the action Mrs. Davis had taken was illegal . . . ." (T. 94).

Davis decided to discuss the matter with Clark the following Monday; since Clark was not at work on Monday, she met with him early Tuesday morning.[3] The accounts of that meeting vary considerably, but both the Administrative Law Judge and the Board found that the meeting included topics other than the layoff,[4] and that Clark raised his voice in the meeting. Although Clark flatly denied discussing the Tuesday meeting with any of the other employees, there was considerable testimony, and both the Board and the Administrative Law Judge found, that Clark "gave an account of the meeting to fellow employees," stating "that he had stood up to Davis and told her what he thought about the layoff." 246 N.L.R.B. No. 39 at 2. The uncontradicted testimony, again credited by the Board and the hearing judge, indicated that Davis was told "that Clark, using profanity, had loudly proclaimed for all to hear that he had told her off in no uncertain terms." 246 N.L. R.B. No. 39 at 2. Davis was told that Clark was "bragging" that he "cussed her out" at the meeting. That afternoon, Davis dis-cussed Clark's behavior with James Simonsen, Datapoint's Vice President of Industrial Relations, and they jointly decided to terminate Clark as part of a "reduction in force" then in progress. (Tr. 91–94, 323–24, 246 N.L.R.B. No. 39 at 2.) Clark was discharged the next day.

*The NLRB Proceedings*

Clark filed a charge with the NLRB on July 20, 1978, alleging that Datapoint had violated Section 8(a)(1) by discharging him on account of concerted activities protected under Section 7. The NLRB Regional Director issued a complaint on September 1, and the matter was heard before an Administrative Law Judge on January 9 and 10, 1979. The judge heard over three hundred transcript pages of testimony from Clark, Davis, Simonsen and six other present or former Datapoint employees. After reviewing the testimony and the exhibits, and making the necessary credibility choices based on first-hand observation of the witnesses, the judge found that Clark had been discharged not because of any protected activity, and not merely because he believed the layoff was illegal or because he expressed that belief to other employees, but instead because he, "in a deprecating, insulting and insubordinate manner, had arrogantly told other employees how he had told Mrs. Davis off . . . ." The Administrative Law Judge found that the incidents surrounding the relocation layoff were merely the culmination "of a series of temper displays indicating his inability to work with some of his fellow employees," and that he was discharged because of his overall poor attitude.

A three-member panel of the Board disagreed with the judge's conclusions. The Board apparently accepted most of the Administrative Law Judge's credibility choices, for example finding, despite his de-

---

**3.** Mrs. Davis held another meeting with the department employees on Monday, July 17, which Clark missed. While details of the relocation were discussed at that meeting, the layoff apparently was not discussed.

**4.** Mrs. Davis testified, and the Administrative Law Judge found, that Clark complained about the failure of Buddy Sauls, his supervisor, to give him overtime work when he wanted it, and also criticized the overall performance of his supervisor, stating "that he, Bradley Clark, could run the print shop a lot better than Buddy Sauls."

nials, that Clark raised his voice during the July 18 meeting with Davis and that he told other employees "that he had stood up to Davis and told her what he thought about the layoff." 246 N.L.R.B. No. 39 at 2. Nevertheless, the Board, essentially giving credence to Clark's version of why he was discharged, discrediting the version given by Datapoint officials and credited by the Administrative Law Judge, found that Datapoint discharged Clark not for insubordination but because he "refus[ed] to accept [Davis's] explanation that the layoff was proper" and continued to make statements to fellow employees that the layoff was illegal. 246 N.L.R.B. No. 39 at 5. Even though Clark acted alone, the Board specifically found that he was engaged in concerted activity:

> [A] conversation may constitute concerted activity although it involves only a speaker and a listener. Further, an individual's actions may be considered concerted in nature if they relate to conditions of employment that are matters of mutual concern to the affected employees .... Nor does the fact that Clark's fellow employees chose not to take any action disqualify Clark's statements from protection. Discussion among employees concerning working conditions is a necessary initial step in concerted activity and to deny protection to this type of discussion because of a lack of fruition would be to nullify the rights guaranteed by Section 7 of the Act.

246 N.L.R.B. No. 39 at 5–6 (footnotes omitted). The Board therefore ordered Datapoint to reinstate Clark with back pay and all lost seniority rights.

*Were Clark's Statements Concerted Activities?*

■ In proceedings to enforce an order of the National Labor Relations Board, we must defer to the Board if there is substantial evidence in the record to support its factual findings. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). However, in cases where the Board does not accept the findings of the Administrative Law Judge, our examination of the record and the Board's findings must be especially critical. *Syncro Corp. v. NLRB*, 597 F.2d 922, 924–25 (5th Cir. 1979); *NLRB v. Florida Medical Center, Inc.*, 576 F.2d 666, 674 (5th Cir. 1974). Particular scrutiny is appropriate where the Board disagrees with some of the credibility choices made by the judge who had the opportunity to see and question the witnesses himself. *Cf. NLRB v. Brazos Elec. Power Co-op, Inc.*, 615 F.2d 1100, 1101–02 (5th Cir. 1980).

■ In this case, the difference between the Board and the Administrative Law Judge rests on both a credibility determination and a conclusion of law. The Board disagreed with the judge's determination of the underlying reasons for the termination of Clark (basically a credibility determination) and also disagreed with the judge's legal conclusion that the statements made by Clark constituted protected concerted activity. After thoroughly examining the record, we hold that there is not sufficient evidence to support the Board's conclusion that Clark was terminated "in an attempt to muzzle him regarding his statements to fellow employees about their working conditions ...." 246 N.L.R.B. No. 39 at 6. We also hold, as a matter of law, that even if Clark was terminated for his statements about the layoff, the termination did not violate Section 8(a)(1) since the statements did not constitute protected concerted activity.

In support of its finding that Clark was not discharged because of insubordination, the Board quoted extensively from the testimony of Mrs. Davis.[5] Although these excerpts do make Davis's motivation seem

5. The Board cited the following testimony:

Upon examination by the General Counsel regarding Clark's contention that the layoff was improper, Davis testified as follows:

Q: What did you do?

A: I told him that it was not illegal, that I would not do anything knowingly that was illegal or immoral or hurtful to the corporation, or anything like that, and that I had checked it with Personnel, the Industrial Re-

ambiguous, and may lend some support to the Board's conclusion that Clark was discharged because of his continuing assertion that the layoffs were illegal, upon reading the whole record we cannot agree that Davis's testimony supports the Board's position. Her testimony, taken as a whole, clearly indicates that she was upset with the rude and belligerent manner Clark displayed in the Tuesday meeting and that she was even more aggravated by the reports of Clark, using profanity, "loudly proclaiming for all to hear in the production area that he had told [her] off in no uncertain terms . . . ." (Tr. 92, 290–91).

Davis reported the incident to James Simonsen, Vice President of Industrial Relations, and they jointly decided to discharge Clark. Simonsen testified about the reasons for the discharge:

lations Department, and it was approved before I announced it to the employees.

Q: And so, based on his challenging the legality of that decision, you determined to discharge him.

A: No, sir. No, sir.

Q: Well, can I find out, please—

A: You surely can, because if—if he had accepted that and gone on to work, everything would have been fine because I had had previous incidents with Brad, we've had altercations with different people in the department, he has, that I have had to resolve.

*But he continued to say that it was illegal, and to say this before all the group.* [Emphasis supplied.]

Upon questioning by the Administrative Law Judge, Davis further testified as follows:

Judge Rasbury: Mrs. Davis, I would like for you to reflect very carefully on this question, but I want to know when did you first determine that Brad Clark should be terminated?

The Witness: I determined it on Tuesday, July the 18th, I believe it was.

Judge Rasbury: Now, was that following the meeting you had with Mr. Clark, or at what time?

The Witness: It was that afternoon.

Judge Rasbury: And what has caused you to make up your mind in the afternoon?

The Witness: After I had learned from him that he still said the actions were illegal and that it was presenting a problem, then I made my call to Mr. Simonsen and talked it over with him, and I told him I felt like he should be terminated. And that's when he reminded me of the corporate reduction-in-force that was in effect.

JUDGE RASBURY: I have a question. Mr. Simonsen, can you tell me why Brad Clark was terminated?

THE WITNESS: Brad Clark was terminated as a result of, I think, a series of incidents over a period of his employment that made it, as far as an employee, he was not an acceptable employee.

JUDGE RASBURY: Was the incident in connection with the moving of the Printing Shop sort of a culmination of a series of events, in your opinion?

THE WITNESS: Well, that was the last incident. I say that that certainly had some bearing on it.

. . . .

JUDGE RASBURY: Would you classify this as insubordination or inability to get along with his fellow workers?

Finally, Davis gave this account of her conversation with Simonsen.

Q: Would you tell us what you said to Mr. Simonsen, please?

A: I'll do my best to recall it, to the best of my knowledge. "Jim, this is Lois Jeanne. I have a great problem that I want to discuss with you and you can probably guess the nature of the person involved, because it's one I have discussed with you before. It's Bradley Clark.

"He is insisting that we have taken an illegal action in asking our production people to take vacation, or time without pay, during the time the department was to make a move from one location to the other.

"I had talked to Bradley that morning. . . . He was very belligerent in his discussions with me, very rude, and other adjectives of that type, and that the discussion became very heated because Bradley raised his voice. He began to challenge the supervision of Mr. Sauls; who is the supervisor of Printing Production, and intimated that he could run the Printing Services Department much better than Mr. Sauls, and could schedule things in a lot better manner."

Q: Now, is that what you told Mr. Simonsen?

A: Yes, in essence it is, yes.

And that Bradley—well, I completed by telling him that Brad said that he still—that it was still illegal, and I told him that he had a right to his opinion, but that it was not illegal action; that I had, of course, discussed it with the Personnel officials before taking that action.

Record at 371–73.

THE WITNESS: I would say it was more in the area of insubordination and inability to work and be part of a productive work team.

(Tr. 331–333.) There is extensive testimony in the record, and several exhibits, relating to other incidents of the failure of Clark to cooperate and get along with his fellow employees. In light of all of the testimony of Davis and Clark, we cannot agree that the rather ambiguous testimony cited by the Board substantially supports its conclusion that Clark was discharged in an effort to "muzzle" his criticism of the layoffs.

█ Even if we assume, for the sake of argument, that Clark was terminated for the statements he made in regard to the layoffs, we hold that the statements did not constitute protected concerted activity. The Administrative Law Judge found that there could be no concerted activity absent at least the contemplation of group action:

> In order to be protected, group talk or activity must look toward some kind of group action. There is not one scintilla of evidence in this case to indicate that the employees of the printing services department of Datapoint desired, contemplated or even wished to take any kind of group action or have an individual represent them in their gripes regarding the one week's plant closure. In other words this was nothing more than the griping of a group of employees to the announcement of a change in working conditions, but hardly rises to the level of concerted activities.

Record at 345. In holding that Clark's actions did constitute concerted activity, the Board applied a standard which would, in effect, protect any actions "relate[d] to conditions of employment that are matters of mutual concern to the affected employees." 246 N.L.R.B. No. 39 at 6. The Board apparently believes that griping about working conditions is a necessary precursor to any concerted activity and therefore must itself be protected as concerted activity.

The Board's notion of concerted activity runs contrary to the law of this circuit, however. In *NLRB v. Buddies Supermar-* *kets, Inc.*, 481 F.2d 714 (5th Cir. 1974), this court squarely faced the identical issue involved in the present case and held that, absent substantial evidence that the discharged employee "was seeking to instigate some form of group action," griping or complaining by a single employee does not constitute concerted activity. The court explicitly adopted that standard for determining concerted activity established by the Third Circuit in *Mushroom Transportation Co. v. NLRB*, 330 F.2d 683, 685 (3d Cir. 1964):

> It is not questioned that a conversation may constitute a concerted activity although it involves only a speaker and a listener, but to qualify as such, it must appear at the very least that it was engaged in with the object of initiating or inducing or preparing for group action or that it had some relation to group action in the interest of the employees.

> This is not to say that preliminary discussions are disqualified as concerted activities merely because they have not resulted in organized action or in positive steps toward presenting demands. We recognize the validity of the argument that, inasmuch as almost any concerted activity for mutual aid and protection has to start with some kind of communication between individuals, it would come very near to nullifying the rights of organization and collective bargaining guaranteed by Section 7 of the Act if such communications are denied protection because of lack of fruition. However, that argument loses much of its force when it appears from the conversations themselves that no group action of any kind is intended, contemplated, or even referred to.

> Activity which consists of mere talk must, in order to be protected, be talk looking toward group action. If its only purpose is to advise an individual as to what he could or should do without involving fellow workers or union representation to protect or improve his own status or working position, it is an individual, not a concerted, activity, and, if it

looks forward to no action at all, it is more than likely to be mere "griping." The present case clearly fails to meet the *Mushroom Transportation* standard.

■ The Board, in its brief, argues that the precedential value of *Buddies Supermarkets* was weakened, if not eliminated, by this court's decision in *Anchortank, Inc. v. NLRB*, 618 F.2d 1153 (5th Cir. 1980). In dicta, that case implied that the *Mushroom Transportation* standard may have been discarded by the Supreme Court in *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975). However, the *Anchortank* court explicitly declined to decide whether *Weingarten* overruled the *Mushroom Transportation* standard, noting that the results in the two cases were consistent with each other. *Anchortank, Inc. v. NLRB, supra*, 618 F.2d at 1161 & n.10. Without a clearly contrary opinion of the Supreme Court or of this court sitting *en banc*, we cannot overrule a decision of a prior panel of this court, and we decline to hold that the dicta of *Anchortank* did so. Moreover, we would not overrule *Buddies Supermarkets* even if we could do so. The Board asks us to set too far-reaching a precedent, one by which virtually any action taken by a single employee in any way related to wages, hours or the terms and conditions of employment would be considered protected concerted activity. If Congress had intended Section 7 to be read so broadly, it certainly could have done so with much more definite language, and courts would have discovered that intent long ago.

Accordingly, enforcement of the order of the National Labor Relations Board is hereby

DENIED.