**GEORGIA KRAFT COMPANY, WOOD-KRAFT DIVISION, Petitioner, Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.**

No. 81–7852.

United States Court of Appeals, Eleventh Circuit.

Jan. 24, 1983.

Rehearing and Rehearing En Banc Denied April 8, 1983.

Powell, Goldstein, Frazer, & Murphy, J. Roy Weathersby, Atlanta, Ga., for petitioner, cross-respondent.

James Callear, Washington, D.C., for respondent, cross-petitioner.

Before KRAVITCH, HATCHETT and CLARK, Circuit Judges.

HATCHETT, Circuit Judge:

In this case we decide that substantial evidence supports enforcement of the National Labor Relations Board's ("Board") findings of unfair labor practices by Georgia Kraft Company, Woodkraft Division ("Georgia Kraft" or "Company") arising out of collective bargaining negotiations and the improper termination of striking employees.

## I. BACKGROUND

Georgia Kraft is an industrial timber company specializing in the production of lumber, wood chips, paper, and related by-products. This appeal concerns the Company's Greenville, Georgia lumber mill, where, in September, 1977, International Laborer's Union, Local # 246 was certified as the exclusive collective bargaining representative of all production and maintenance employees.

## A. Contract Negotiations

Pursuant to the terms of the parties' existing collective bargaining agreement, the Union notified the Company in July, 1979, of its desire to renegotiate the agreement. Beginning on September 11, 1979, and on various other dates over the next three months, the parties met to negotiate the terms of a new agreement. Broughton Kelly, Director of Labor Relations, represented the Company throughout the negotiations, and Charles R. Barnes, Business Manager for the Union's district council, represented the Union during the first four bargaining sessions. Howard Henson, the Union's regional manager, represented the Union at sessions held on November 29, and December 3, 1979.

At the first meeting on September 11, the Union submitted proposals of desired changes in the existing agreement. At subsequent meetings, the Company responded to the Union's proposals by either agreeing, insisting that the current contract's provisions remain the same, or proposing changes of its own.[1] Failing to reach an agreement by October 31, the expiration date of the existing contract, the Company and the Union agreed to extend the contract until November 15. When no substantial progress resulted from a brief meeting on November 14, the Union voted to strike the following day. On November 15, all bargaining employees walked off their jobs and established a picket line outside the plant.

On November 27, the parties met and reached agreement on some issues; many provisions, however, remained unsettled. From the beginning of negotiations, the Company sought elimination of the plant's point system and the establishment of area job classifications and lines of progression in order to diminish lateral movement. Under the point system, each employee was placed in a job classification/pay grade. Each grade had a certain number of points related to the grade. These points entitled the employee to a certain rate of pay. The individual job functions within each department at the plant were assigned points relating to the job. As an employee learned new jobs, he or she received credit for the points assigned to that particular job. The Company disliked this system because seventy-five percent of the employees at the plant had accumulated the total amount of points available within his or her respective department. Accordingly, wages at the Greenville mill were remarkably higher than at other mills.

The Union and Company representatives met again on November 29, at the office of the Federal Mediation and Conciliation Service in Atlanta. Despite the presence of Henson, the Union's regional manager, no significant progress resulted. At a December 3 meeting between Kelly and Henson, Henson presented Kelly with the Union's wage proposal and Kelly gave Henson a Company proposal concerning seniority, departmental point systems, and lines of progression. This was the Company's third such proposal regarding these subjects. Because he was not authorized to make specific concessions, Henson stated that he would take the Company's proposals back to the Union's negotiating committee. At the end of this meeting, Kelly handed Henson a list of striking employees whom the Company planned to discipline because of alleged misconduct during the strike. Henson refused to discuss the striker discipline issue, taking the position that it was a matter between the local union and the Company.

On December 9, the Union's negotiating committee voted to accept the Company's proposals on all unsettled contract provisions and sent the Company the following telegram:

> This is to advise you that the last company offer presented on December 3, 1979, has been accepted as a final and binding contract[.] All employees who could be contacted will return back to work on their regularly assigned shifts effective

---

1. The Company asserted its position by submitting individual provisions rather than an integrated document. Some of the Company's proposals were handwritten, some typed. As the Board's order notes, "bargaining was not a model of neatness and organization."

December 10, 1979[.] We are prepared to meet at your convenience to sign the agreement[.]

Tommy L. Williams Business Manager Local Union 246.

As promised, the strike ended the following day. Kelly notified the Union by letter on December 11, that several matters required resolution before an agreement could be finalized. On the same day, Barnes sent Kelly a letter requesting a meeting in order to finalize the language and sign the agreement. At a meeting on December 19, Kelly presented to Barnes a document entitled "Memorandum of Agreement." This document contained proposals agreed to by the Union's December 9 telegram and a number of strike-related proposals. One such provision called for the termination of twenty-five employees for misconduct and provided that "such terminations are final and binding on the Union." Another provision required the Union to agree to withdraw "any proceeding or filing which it has initiated or plans to initiate with the National Labor Relations Board or courts against the Company or its employees." Barnes acknowledged the Union's agreement on most of the provisions contained in the memorandum, but refused to sign the document because of the inclusion of those provisions regarding strike-related matters and the termination of certain employees.

Until March of 1980, the parties' contacts consisted primarily of Company allegations that specific matters remained unsettled and the Union's counter that it was prepared to sign an agreement as soon as possible. In a March 3 letter to the Union, Kelly strenuously denied that a collective bargaining agreement had been reached and that, in any event, the Union had failed to submit any document which the Company could sign. On March 12, the Union noti-fied the Company that the collective bargaining agreement was typed and ready to be executed and requested a date to meet and sign the agreement. Kelly replied on March 14 by requesting a copy of the alleged agreement and stated that the Company's position remained the same. Subsequent requests by the Company for a copy of the alleged agreement were denied or unanswered, and scheduled meetings were postponed. On July 11, some four months after the agreement was typed and ready for execution, the Union submitted to the Company a draft of what was agreed to on December 9.

### B. Termination of Certain Striking Employees

At the conclusion of the strike, twenty-eight strikers who reported to the plant for duty were not put back to work. The Company notified twenty-five of those twenty-eight that they had been terminated for alleged misconduct. Among those discharged were Landis Bishop, Jeffrey Hughes, and Preston Barlow.

The Company's separation notices to Bishop and Hughes state that they were discharged for visiting the home of a non-striking employee and threatening his family and property. The non-striking employee, William Walker, testified that Bishop and Hughes came to his home one night during the strike to find out why he had returned to work and was not on the picket lines. Walker, claiming that Bishop and Hughes reeked of liquor, replied that he reported to work because he needed the money. He further testified that Bishop and Hughes made vulgar comments in the presence of his young daughter and pregnant wife.[2]

The Company discharged Preston Barlow for directing vulgar language at Industrial

---

2. Walker testified on direct examination as follows:

They was standing in there and they was— let's see, it was Landis Bishop. Bishop told me that if I returned to work that he would take care of me and I asked him what he meant by that and he started laughing and Jeff said, "yeah, we'll take care of you." I asked them—I said, "what do you mean by that?" I repeatedly was asking him and he was talking about that I shouldn't have been crossing the picket line and Jeff Hughes called me a "sorry mother fucker" for taking their money away from them. My little girl was standing right beside me. I couldn't leave them and try to get her out of the room.

Relations Manager Barbara Lawler while Barlow was on the picket line. Lawler testified that while crossing the picket line in her car on two occasions, Barlow shouted obscene remarks as she passed the picketing employees.[3]

### C. Proceedings Below

The Union filed complaints with the Board alleging, among other things, that the Company violated sections 8(a)(1), (3), and (5), of the National Labor Relations Act, 29 U.S.C.A. §§ 158(a)(1), (3), and (5), by refusing to execute a collective bargaining agreement on which the parties had agreed and by discharging and thereafter failing to reinstate certain employees for alleged misconduct occurring during the strike.[4] At a hearing on these complaints, the administrative law judge (ALJ) found that the parties had not reached an agreement on a new collective bargaining contract, and therefore, the Company had not violated section 8(a)(5) of the Act. The ALJ found that the major impediment to an agreement was the issue of striker discipline. Regarding the December 3 negotiations between Henson and Kelly, the ALJ found that Kelly raised the issue as a contractual proposal. Because Henson refused to discuss this issue, the ALJ found that the parties had failed to reach a meeting of the minds. Finally, the ALJ concluded that the Company did not violate section 8(a)(1) of the Act in discharging Bishop, Hughes, and Barlow because their actions were of sufficient gravity to warrant such discipline.

Contrary to the ALJ, the Board found that a collective bargaining agreement had been reached on December 9 when the Union sent its telegram accepting the Company's last offer. The Board found that the Company did not raise striker discipline as a bargainable issue at the December 3 negotiating session, nor make it a condition to the resolution of an agreement. Interpreting the Company's December 19 "Memorandum of Agreement" as introducing new contingencies in the negotiations in order to buttress its position that no agreement had been reached, the Board found that the Company, by refusing to acknowledge the agreement and assist the Union in reducing the agreement to writing, had obstructed and frustrated the bargaining process. The Board also concluded that the Company violated section 8(a)(1) of the Act in that the actions of Bishop, Hughes, and Barlow were not sufficiently egregious to warrant their discharge.

### II. ISSUES

Georgia Kraft's petition raises two issues: (1) whether substantial evidence in the record as a whole supports the Board's finding that Georgia Kraft and the Union reached an agreement on a collective bargaining contract; and (2) whether the Board erred as a matter of law in finding that the actions of Bishop, Hughes, and Barlow did not warrant termination.

---

3. Lawler's testimony is as follows:

Then, he started to—he kind of turned and he was turning, but as he turned around and circled and then I heard "that mother fucker, that ugly bitch," and two of the employees standing next to him—I can't recall because I really was not paying any further attention than what I just told you—and they turned around as he was saying this and kind of looked off to the side; ....

....

It wasn't too long after that time, my guesstimate somewhere around a week or maybe a little more—I know there was the same people there. It was early in the morning and I was coming into work and Doug was on picket duty because he did have a sign. As I went through, he directed some more abusive language and it was something along that line of "the bitch" or something like that. I can't recall, but it was, again, directed at me.

4. Title 29 U.S.C.A. § 158(a) provides:

(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

....

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization....

....

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

## III. DISCUSSION

### A. Collective Bargaining: Was an Agreement Reached?

Georgia Kraft contends that no agreement was reached via the Union's telegram because of the Union's previous refusal to discuss striker discipline. Further, even if the Union's rejection of the December 3 proposal on striker discipline is not an obstacle to a collective bargaining agreement, the telegram still fails to constitute an adequate acceptance. Other significant issues such as wages, effective date of the contract, seniority provisions, permanent promotions and transfer provisions, temporary assignments, and temporary vacancies remained unsettled. The Board claims that the evidence of record does not support either of the Company's contentions. According to the Board, the issue of striker discipline was not presented as a negotiable proposal on December 3, nor was it an issue upon which resolution of a collective bargaining agreement was contingent.

The evidence presented to the ALJ on this issue consists only of Kelly's testimony and the parties' stipulation to Henson's testimony. On direct examination, Kelly explained that the reason for giving Henson the list was to "advise [the Union] about the situation with these employees" and "inform [Henson] of the conduct of these people . . . that we intended to terminate." When asked if he wished to bargain over the list of employees, Kelly replied that "the subject was opened [sic] to bargain if [Henson] had some specific request in regard to the people." When asked a second time if he wished to bargain about the list of strikers, Kelly responded:

> No, not specifically. As I gave Mr. Henson that particular piece of paper, his reaction . . . was that he did not want to get involved with the termination of any strikers, and that the International Union

was withdrawing from the negotiations. We really didn't discuss that at all. We took that position right off.

Kelly further testified that he gave the list after the parties had discussed each others' proposals, and that he told Henson it was the Company's position that some form of disciplinary action was justified for the employees on the list.[5] Based on this evidence, the ALJ reasoned that the Company submitted the striker discipline issue as a matter to be resolved by contract. Because the Union refused to discuss the issue, and did not intend to accept any proposal on discipline in the December 9 telegram, the ALJ concluded that no agreement had been reached.

In reviewing an order of the National Labor Relations Board, we are bound by the Board's factual findings if they are supported by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–465, 95 L.Ed. 456 (1951); *Weather Tamer, Inc. v. NLRB,* 676 F.2d 483, 487 (11th Cir.1982). In those cases where the Board does not accept the ALJ's findings, however, this court's examination of the Board's findings must be especially critical. *NLRB v. Datapoint Corp.,* 642 F.2d 123, 126 (5th Cir.1981); *Syncro Corp. v. NLRB,* 597 F.2d 922, 924–25 (5th Cir.1979). "Particular scrutiny is appropriate where the Board disagrees with some of the credibility choices made by the judge who had the opportunity to see and question the witnesses himself." *Datapoint,* 642 F.2d at 126.

Contrary to Georgia Kraft's contentions, the Board did not reject credibility determinations made by the ALJ in this case. *See NLRB v. Ridgeway Trucking Co.,* 622 F.2d 1222, 1224 (5th Cir.1980). *Compare NLRB v. Datapoint Corp.,* 642 F.2d at 126 (differences between Board and

---

5. The parties stipulated that Henson would have testified as follows:

Kelly said that he did not want to deceive me and handed me another piece of paper . . . with names of people that the Company intended to fire. I told Kelly the meeting was

over and I would not discuss anything about firing strikers. At no time during this meeting did Kelly say anything about any other areas that the parties may have discussed before.

ALJ rested on both credibility determinations and conclusions of law); *Syncro Corp. v. NLRB,* 597 F.2d at 925 (ALJ possesses superior advantage in evaluating credibility of witnesses' record testimony). Rather, this case involves "a difference in overall judgment as to proper inferences to be drawn from largely undisputed evidence" between the Board and the ALJ. *NLRB v. Florida Medical Center, Inc.,* 576 F.2d 666, 674 (5th Cir.1978). Accordingly, we find that the Board did not discredit Kelly's testimony, but rather rejected the ALJ's conclusions as to the inferences to be drawn from Kelly's testimony and Henson's stipulated testimony. A disagreement between the Board and the ALJ on factual inferences and legal conclusions does not detract from the substantiality of the evidence that must support the Board's decision, nor does it modify the appropriate standard of review in this court. *See Universal Camera,* 340 U.S. at 496, 71 S.Ct. at 468–469.

■ We agree with the Board that the striker discipline issue was not a bargainable topic in need of resolution before a collective bargaining agreement could be reached. At no point during negotiations did the Company indicate that a new contract was contingent upon resolution of this issue. Although bargainable in the sense that the Company had not decided on the severity of discipline by the December 3 meeting, the uncontroverted evidence reflects that the Company's purpose in raising the matter was to give the Union notice of its proposed action.[6] Because it was never intended to be a contractual provision, striker discipline was not, contrary to the ALJ's holding, an impediment to a collective bargaining agreement.

Finding that the striker discipline issue was injected into the negotiation process on December 3 as a contractual proposal, the ALJ deemed it unnecessary to consider whether other contractual issues remained unresolved. Thus, it was necessary for the Board to examine the contractual proposals outstanding as of the December 3 session to determine whether an agreement was indeed obtainable. The Board concluded that when the Union telegraphed its acceptance on December 9, a binding contract was formed and the Company's notification on December 11 that it was not prepared to execute a collective bargaining agreement constituted a violation of section 8(a)(5) of the Act.

■ After three months of negotiations, the parties' stance on various contractual issues had become fixed. Thus, by December 3, the Company had specific positions on such issues as seniority, departmental point systems, contract duration, and wages.[7] Barnes testified that, by its December 9 telegram, the Union accepted the most recent Company proposals on undecided issues and withdrew all outstanding proposals of the Union. Therefore, the Board found it necessary to determine initially whether the Company's offers in the disputed areas were still viable as of December 9. *See Pepsi-Cola Bottling Co. v. NLRB,* 659 F.2d 87 (8th Cir.1981). The Board found that as of December 9, all contractual provisions were the subject of specific proposals and had not been withdrawn prior to the Union's December 9 acceptance. That the Union originally rejected proposals is irrelevant. In the collective bargaining setting

> A contract offer is not automatically terminated by the other party's rejection or counterproposal, but may be accepted within a reasonable time unless it was

---

6. Kelly's testimony supports this conclusion. In response to questioning by his counsel on direct examination regarding whether the Company intended to bargain with Henson about the list, Kelly replied:

> Yes, we could have. I told him the title we put at the top of the thing, "People To Be Terminated," but during a meeting when I talked to him, I didn't say the people were absolutely fired and were never going to

> come back. I said that some disciplinary action is justified.

7. Effective November 19, 1979, the Company implemented the terms of its last economic offer made to the Union, the offer ultimately accepted by the December 9 telegram. This wage offer clearly reflects that the Company contemplated a contract of three years' duration.

expressly withdrawn prior to acceptance, was expressly made contingent upon some condition subsequent, or was made subject to intervening circumstances which ma[k]e it unfair to hold the offeror to his bargain.

*Pepsi-Cola Bottling,* 659 F.2d at 89–90 (footnote omitted).

■ The Board's decision to determine the viability of all proposals was entirely appropriate. Because Barnes' testimony clarified what the Union was accepting, the only remaining question was whether the Company's proposals were still viable. As for the effective date of the new agreement, neither the Company nor the Union sought to disrupt the continuity between the existing contract and the new one. The Company's December 19 "Memorandum of Agreement" calls for an effective date of November 1, 1979, and neither party has objected to this date.[8]

■ Georgia Kraft calls our attention to the fact that the document prepared by the Union and submitted to the Company contains discrepancies from the proposals tabled by the Company and agreed to by the Union on December 9. According to the Company, these discrepancies reinforce the argument that an agreement was never reached. We disagree. The Board has not required the Company to execute the Union's document, but rather a contract embodying the agreement reached between the parties on December 9. The Company is therefore required only to execute an agreement that accurately reflects the most recent proposals accepted by the Union in its December 9 telegram. The Board found discrepancies in the Union's document re-

sulting not from lack of agreement, but due to the Company's refusal to assist the Union in reducing the agreement to writing prior to the resolution of the strike-related issues. We find no error in this ruling. Simply put, the variations between the document as drafted and the December 9 agreement are no defense to the enforcement of the Board's order.

### B. Discharge of Striking Employees

■ Economic strikers such as Bishop, Hughes, and Barlow, retain their employee status and, upon an unconditional application to return to work, must be reinstated if former or substantially equivalent positions are available. *NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 378–79, 88 S.Ct. 543, 545–546 (1967); *C.H. Guenther & Son, Inc. v. NLRB,* 427 F.2d 983, 985 (5th Cir.), *cert. denied,* 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970). While an employer's refusal to reinstate such employees is deemed presumptively discriminatory, the employer may rebut the presumption by demonstrating that the employee engaged in misconduct during the strike falling outside the protection of the Act. *Associated Grocers of New England v. NLRB,* 562 F.2d 1333, 1335 (1st Cir.1977). Contrary to the ALJ, the Board determined that although Bishop, Hughes, and Barlow had engaged in misconduct during the strike, it was not sufficiently serious to warrant their discharge. In so doing, the Board did not reject the credibility determinations made by the ALJ. Regarding Bishop and Hughes, the Board found the remark about "taking care" of Walker ambiguous and unaccompanied by violence or physical ges-

---

8. Georgia Kraft argues that the Board's order signifies an effective date of December 9, the Union's acceptance date. We read the order as holding otherwise. The Board stated that

the record reflects that the old contract expired on October 31, and that, throughout negotiations, neither side had articulated any proposal that would break the continuity between the expired contract and the new one. Indeed, that [the Company] contemplated no such hiatus is obvious from its December 19 "Memorandum of Agreement," which calls for an effective date of November 1.

As indicated earlier, by agreement of the parties, the expiration date of the existing date was extended from November 1 to November 15, 1979. The Company notified the Union on November 16 that it would implement its new wage proposal on November 19. Despite a counter proposal raised by the Union at the December 3 session, the Union accepted the Company's previously implemented wage scale. To be more accurate, the effective date of the new collective bargaining agreement was November 15, 1979.

tures. Because this was an isolated incidence of verbal intimidation, the Board ordered Bishop and Hughes reinstated. The Board ordered similar reinstatement for Barlow based on its determination that his lewd and insulting characterizations directed at Industrial Relations Manager Barbara Lawler were insufficient to warrant discipline. We are mindful that "when there are differing views about the interpretation or significance of undisputed facts, each case must be decided on its particular circumstances, keeping in mind that labor disputes are ordinarily heated affairs . . . ." *Boaz Spinning Co. v. NLRB*, 395 F.2d 512, 514 (5th Cir.1968) (footnote omitted). Moreover, the Board is entitled to considerable deference in determining the scope of protected activity under section 7 of the Act, 29 U.S.C.A. § 157.[9] *NLRB v. Pipefitters Local 638*, 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977); *Associated Grocers*, 562 F.2d 1333, 1336. Reviewing the particular circumstances of this case, we enforce the Board's order reinstating the discharged employees.

### LANDIS BISHOP and JEFFREY HUGHES

 Georgia Kraft urges us to reject the Board's standard that verbal threats, short of a direct threat of immediate physical harm, lose the protection of the Act only when accompanied by physical acts or gestures. Instead, the Company advocates the objective standard followed by the First Circuit in *Associated Grocers* and the Third Circuit in *Local 542, Operating Engineers v. NLRB*, 328 F.2d 850 (3d Cir.), *cert. denied*, 379 U.S. 826, 85 S.Ct. 52, 13 L.Ed.2d 35 (1964). In determining when conduct is due the protection of the Act, those circuits consider "whether the misconduct is such that, under the circumstances existing, it may reasonably tend to coerce or intimidate employees in the rights protected under the Act." *Local 542, Operating Engineers*, 328 F.2d at 852–53. *See also, NLRB v. W.C.*

*McQuaide, Inc.*, 552 F.2d 519, 520 (3d Cir. 1977). Although both standards have merit, it is our belief that the Board's standard comports with section 7 of the Act, in protecting strike-related conduct. Tested by the standard of the Board, Bishop and Hughes' verbal threats were not sufficient to justify their termination from employment.

In *NLRB v. Moore Business Forms, Inc.*, 574 F.2d 835, 845 (5th Cir.1978), a striker was held dischargeable for issuing a threat similar to the one issued by Bishop and Hughes. When a non-striking employee informed a striker that he was working because he had to, the striker retorted, "there's ways to keep you from it." 574 F.2d at 845. The court denied reinstatement because of this threat. The circumstances surrounding the strike in *Moore Business Forms*, however, were different from those at Georgia Kraft's Greenville plant. In *Moore Business Forms*, the strike was marked by pervasive violence directed not only at company and personal property, but toward persons as well. The evidence before the ALJ in this case indicates that although the Greenville strike was not immune from violence, the acts were directed only at company property. We find this evidence sufficient to provide a basis by which to distinguish *Moore Business Forms*.

### PRESTON BARLOW

 We agree with the Board that Barlow's crude and obscene remarks directed at a female management executive as she crossed the picket line did not warrant his termination. Verbal obscenities which accompany threats of physical harm constitute serious misconduct and are not protected by the Act. *See e.g., Firestone Tire & Rubber Co. v. NLRB*, 449 F.2d 511, 512 (5th Cir.1971). Name-calling, however, without more, is privileged under the free speech provisions of section 8(c) of the Act, 29

---

9. "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in

other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C.A. § 157.

U.S.C.A. § 158(c).[10] The order reinstating Barlow as an employee of Georgia Kraft is enforced.

### IV. CONCLUSION

As hereinabove set forth, the order of the Board is enforced.

ENFORCED.

CLARK, Circuit Judge, concurring in part and dissenting in part:

My dissent is limited to that part of the majority opinion enforcing the NLRB order that reinstates Landis Bishop and Jeffrey Hughes. The testimony cited at note 2 of the majority opinion and the record reflect that Bishop and Hughes went to Walker's house and addressed him at the doorway. I take the language "yeah, we'll take care of you" as a threat, given the context of the conversation. I refuse to join in sanctioning strike-related conduct that can generate fear in a person when he is standing in the door of his home.

---

**10.** This section provides:

The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an un-fair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C.A. § 158(c).