**NATIONAL LABOR RELATIONS BOARD, Petitioner, Cross-Respondent,**

v.

**McEVER ENGINEERING, INC., Respondent, Cross-Petitioner.**

No. 85–4603
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

March 10, 1986.

Elliott Moore, Deputy Associate Gen. Counsel, Nancy Hunt, Atty., Kenneth Hipp, Supervisor, Washington, D.C., for petitioner, cross-respondent.

Sears & Parker, Franklin R. Sears, Epstein, Becker, Borsody & Green, Bettye S. Kitch, Fort Worth, Tex., for respondent, cross-petitioner.

Before POLITZ, GARWOOD and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This case is before the court upon application of the National Labor Relations Board (the "Board"), pursuant to section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e) (the "Act") for enforcement of its unfair labor practice order against McEver Engineering, Inc. ("McEver"). The Board found[1] that McEver had violated section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by firing seven employees who, faced with unusually hazardous working conditions, had concertedly engaged in a work stoppage. The Board also found that one of the seven employees, although alleged by McEver to be a foreman, was not a supervisor within the meaning of section 2(11) of the Act, 29 U.S.C. § 152(11), and was therefore protected by section 7, 29 U.S.C. § 157. The Board ordered McEver to reinstate the seven men and to make each of them whole for any earnings lost as a result of the discharges. We find substantial evidence in the record as a whole to support the Board's findings, and therefore enforce the Board's order.

I.

In October 1982, eleven of McEver's construction crew employees were working at the Texas Lime Company plant near Cleburne, Texas. McEver was serving as the Texas Lime Company's independent contractor. The work consisted of installing new equipment, rebuilding old equipment, and repairing and replacing guard rails, all on the tops and sides of eighty-foot-tall lime tanks. The work was done outside and required the use of electricity for the necessary welding, cutting, and grinding. A large crane was available to lift workers from the ground to their work stations and back. The men had no shelter from the elements. They were not represented by a labor organization.

The weather on October 21, 1982, was rainy, at times heavily so, with intermittent showers, mist, and fog. Early in the day there was thunder and lightning. The project superintendent, Bill Brickell, testified at trial that he expected a "rain-out" to be declared and work to be called off for the day. However, a power outage had caused a shutdown of the Texas Lime plant, and Texas Lime officials pressured Mel Steger, the project manager for McEver, to put the men to work. Thus, despite shouts and complaints about working in the rain from some employees assembled in the tool house awaiting orders from Brickell and Steger, the men were ordered to start work.

Brickell testified that the working conditions at this plant were hazardous even in the best weather. "There [are] no good working conditions.... You have either got lime in your eyes, you['ve] got quick lime on you, it is burning you. If it rains, it is slick, it is muddy, it is messy. If it is dry and the wind is blowing, it gets in your nose and in your lungs ... the working conditions were not good at the lime plant." No one has claimed otherwise. The administrative law judge (ALJ) therefore found that on the morning in question the em-

1. The Board's order was issued on June 28, 1985, and is reported at 275 N.L.R.B. No. 128 (1985). Members Hunter and Dennis formed the majority, with Chairman Dotson dissenting.

ployees faced serious hazards arising from the already dangerous conditions at the lime plant.

Some of the employees testified at trial that they received electrical shocks while working with power tools in the wet weather, and that they were subjected to slips, falls, and near-falls on the lime-encrusted surfaces of the catwalks and the tanks' sloping sides. The four-foot guard rails on top of the tanks had gaps in them, thus failing to offer complete protection. Visibility was poor because of the lime blowing in the wind and sticking to work surfaces, muddying the men and their equipment. The windshield of the crane was useless; the crane operator was forced to lean out of the window of his cab in order to see the hand signals used to direct him in transporting the men, tools, and equipment. Attached to the end of the crane boom was a sliding basket, four feet square, where the men were carried with the equipment to the guard rail area of the tank. Once he reached his destination, a man had to climb out over the top of the basket, then crawl down the other side of the guard rail to the catwalk. The crane operator, leaning out of the cab to see what he was doing, had to stretch from an awkward position to operate the crane controls.

The employee passengers confronted these conditions and the maneuverings in and out of the basket at considerable heights, onto surfaces slickened by wet lime, in the control of an operator handicapped by wind, rain, and blowing lime, at various times through the morning; as the rain fell harder, the men were brought down from their perches, assembled in the tool shed, and then ordered back up again whenever the rain slackened. They had no protective clothing. Other employees, assigned to work at lower elevations or on the ground, reported to supervision that weather conditions made it impossible to work.

During an interval of hard rain while the men were assembled in the tool shed, many of them discussed how hazardous it was on top of the tanks. Preston Ray testified,

and the ALJ found, that he had received electrical shocks that morning while welding, and that he told Brickell, "This is a bunch of bull, working in these kinds of conditions." Brickell acknowledged Ray's complaint by saying, "I know it. I tried to get him [Mel Steger] to send them home, but it's not me, it's Mel." Ray also complained to Steger at this time, but Steger merely referred to the fact that a Texas Lime official wanted the work done. The ALJ also found that Thomas Murray, another member of the crew, told Steger and Brickell that it was too dangerous and slick outside, and that nearly everyone complained at one time or another to the supervisors. When again the rain slackened, however, the men were ordered back to work.

Shortly after this return to their positions, the men were once again forced by renewed heavy rainfall to descend and seek shelter in the tool shed where, as it continued to rain, they remained until the noon lunch period.

At noon, the seven employees whose discharges are at issue here drove together to have lunch at a location approximately three-quarters of a mile from the worksite. The ALJ found that during their half-hour lunch break, the seven men discussed the working conditions. Some expressed an unwillingness to return to work in their wet clothes; others feared that a dangerous fall would occur and the person involved would never be able to work again. Finally, the men together decided not to return to work at the conclusion of the lunch break.

When the seven employees failed to return from lunch at 12:30, Brickell sent the company clerk, Eddie Challenger, to investigate. Brickell and Challenger knew where the men had gone for lunch because they had seen their parked vehicles when they themselves had returned from lunch in town. The ALJ found that when Challenger questioned the men, he was told by two of them that they were not going to return to work until the rain stopped, and that when it stopped they would return.

When Brickell learned from Challenger only that the men "were not ready to come back to work," he instructed Challenger to fill out termination slips for all of them. The stated reason for the discharges was failure to return to work. Shortly thereafter, Steger confirmed Brickell's decision to fire the men. The ALJ found that despite his knowledge that the men were three-quarters of a mile away, Steger did no investigation of their reasons for failing to return beyond asking some substitute electricians on the tanks if they knew what the problem was.

The seven men returned to the jobsite when the rain stopped at approximately 1:30 p.m. At this time they were told that they had been discharged. The ALJ found that after some heated discussions between Steger and a Texas Lime official and some of the men, the employees packed their tools and left the premises. Steger and Brickell admit that the men were discharged solely because they had failed to return to work at 12:30 p.m.

## II.

On November 29, 1982, Thomas Murray, one of the seven terminated employees, filed a charge with the Board's regional office in Fort Worth, Texas, alleging that he, Ector Yzaguire, Kevin Morgan, Ron Emerson, Kenny Hampton, Arthur Wallace, and Preston Ray had been discharged "because they concertedly refused to work in abnormally dangerous working conditions." After investigating the charges, the Board issued a complaint on December 23, 1982, alleging that McEver had discharged, and failed and refused to reinstate, the seven employees because they had "engaged in concerted activities for the purpose of collective bargaining or other mutual aid or protection."

Following an evidentiary hearing, the ALJ found that McEver had discharged the seven for taking concerted activity protected by section 7 of the Act. The ALJ therefore charged McEver with having violated section 8(a)(1) of the Act, and ordered it to offer the men reinstatement without prejudice to their seniority or other rights or benefits, and to make them whole for any loss of earnings they had suffered. McEver was also ordered to expunge from its records any reference to the seven discharges, and to notify the men in writing that evidence of their discharges would not be used for future personnel actions.

The ALJ also found that Preston Ray was not a supervisor under section 2(11) of the Act. Ray was therefore held to be protected by section 7 and covered by the ALJ's order.

The Board affirmed the findings and conclusions of the ALJ and adopted his recommended order.

McEver contends on appeal that because they were not engaged in protected activity, it was no violation of section 8(a)(1) to fire the seven employees. McEver alleges that the employees' refusal to return to work after lunch constituted a "partial" strike, unprotected by the Act. McEver argues in the alternative that even if the men were not engaged in a partial strike, their work stoppage was simply a refusal to perform activities that were a legitimate part of their job duties, and therefore was not protected activity. McEver also contends that no substantial evidence supports a finding that either the clerk Eddie Challenger or the seven discharged men had put McEver on notice as to a reason for the work stoppage. Next, McEver claims that it had no unlawful intent to interfere with the employees' allegedly protected, concerted activity, and that therefore the Board's decision in *Meyers Industries, Inc.*, 268 N.L.R.B. 493 (1984), *vacated and remanded sub nom Prill v. NLRB*, 755 F.2d 941 (D.C.Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 313, 88 L.Ed.2d 294, and —— U.S. ——, 106 S.Ct. 352, 88 L.Ed.2d 320 (1985), mandates a finding that there was no violation of the Act. Finally, McEver disputes the Board's finding that Preston Ray was not a statutory supervisor.

In regard to the Board's order of reinstatement for all of the alleged discriminatees, McEver argues that post-discharge

misconduct by Morgan and Ray precludes their being awarded that remedy.

There are thus three issues presented by this case. First, we must examine whether the Board's decision that McEver discharged the seven employees for engaging in protected concerted activities is supported by substantial evidence in the record as a whole. *See Universal Camera Corp. v. National Labor Relations Board,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Second, we examine under the same standard the Board's conclusion that Preston Ray, one of the discharged employees, is not a supervisor under section 2(11) of the Act. Third, we are faced with the question of the appropriateness of the reinstatement remedy granted to Morgan and Ray.

### III.

Section 7 of the National Labor Relations Act guarantees statutory employees the right "to engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) of the Act enforces this guarantee by making it unlawful for an employer to interfere with, restrain, or coerce employees in the exercise of their section 7 rights. The guarantees and protection of section 7 are afforded equally to nonunion employees and union employees; a collective bargaining agreement need not be in effect for the Act to apply. *E.I. du Pont de Nemours and Co. v. NLRB,* 707 F.2d 1076, 1078 (9th Cir.1983); *NLRB v. Columbia University,* 541 F.2d 922, 931 (2d Cir.1976). Employees' activities are protected by section 7 if they might reasonably be expected to affect terms or conditions of employment. *Brown & Root, Inc. v. NLRB,* 634 F.2d 816 (5th Cir.1981).

Here the alleged protected activity is the right to engage in a work stoppage as a means of protesting an unsafe working condition. We recognize, of course, that not all work stoppages are protected. Employee refusals to perform some established job duties are generally not deemed protected activities; such conduct is viewed as an attempt to dictate unilaterally the terms and conditions of employment. Thus an employee who continues to work, but refuses to obey the employer's orders to perform activities forming a legitimate part of his work, is considered to be conducting a partial strike and is not protected. *See, e.g., NLRB v. GAIU Local 13–B, Graphic Arts International Union,* 682 F.2d 304, 308 (2d Cir.1982); *Excavation Construction, Inc. v. NLRB,* 660 F.2d 1015, 1020–21 (4th Cir.1981); *Audubon Health Care Center,* 268 N.L.R.B. 135, 137 (1983); *Daniel Construction Co.,* 267 N.L.R.B. 1213, 1221–22 (1983).

A partial strike, however, is to be distinguished from a one-time strike of short duration. A brief, one-time strike is presumptively protected activity. *See NLRB v. Pace Motor Lines, Inc.,* 703 F.2d 28 (2d Cir.1983); *Richard Schubert Associates, Inc.,* 222 N.L.R.B. 867, 872 (1976); 2 *The Developing Labor Law* 1017–18 (C. Morris 2d ed. 1983). The seven McEver employees did not refuse to perform certain tasks while accepting others. Instead, they completely stopped working—in effect, walked off the job—and refused to work at all until the rain had stopped. We therefore hold that the employees' action, a one-time work stoppage of short duration, is presumptively protected by the Act.

McEver's contention that the work stoppage was a simple refusal to perform legitimate, i.e., not unusually unsafe, job duties is equally without merit. The Board found that the unsafe conditions present on October 21, 1982, were not a routine circumstance of the job. *McEver Engineering, Inc.,* 275 N.L.R.B. No. 128, slip op. at 2. Superintendent Brickell testified at trial that he "would have declared a rain-out" if he had not been under pressure from Texas Lime officials to complete the work. Employees testified that although they had worked in the rain in the past, they had not done so during "downpours," nor while on

top of the tanks.[2] Transcript at 111. The Board's finding that working in the hard rain of October 21 on top of a lime tank was not a routine legitimate job requirement is more than adequately supported by substantial evidence in the record.

The ALJ found that the seven discriminatees had not made a "specific demand" to McEver to relieve them of the unsafe working conditions, but that the failure to do so did not render their conduct unprotected. Where, as here, the employees are unrepresented, and the employer "should reasonably see that improvement of working conditions is behind the employees' action," the ALJ found no need for a specific demand.

■ Before an employer can be held to have discriminated against its employees for their protected activity, the Board must show that the supervisor responsible for the alleged discriminatory action knew about the protected activity, and that the employees' protected activity was a motivating factor in the employer's decision. *Air Surrey Corp. v. NLRB*, 601 F.2d 256, 257 (6th Cir.1979); *cf. NLRB v. Gulf States United Telephone Co.*, 694 F.2d 92, 95 (5th Cir.1982), and *Pioneer Natural Gas Co. v. NLRB*, 662 F.2d 408, 412 (5th Cir.1981) (substantial evidence must support a finding that the employer knew about the employees' union activities and that the employer's conduct was motivated by anti-union animus). McEver claims that it was not on notice of the seven employees' reasons for not returning to work. According to McEver, several other employees continued to work on the tank after lunch; the rain had stopped by 12:30, the end of the employees' lunch break;[3] the seven employees left their tools in place during lunch, indicating an intent to return; and

the seven men, as well as other employees, had worked during the morning in rainy conditions more severe than those existing after lunch. For these reasons, argues McEver, it was not "readily apparent" to company officials that the employees' work stoppage was a protest against dangerous working conditions.

McEver's argument does not persuade us, however, in the light of the fact that supervisor Brickell specifically sent a company representative, the clerk Eddie Challenger, to ask the seven men why they were not returning to work. The ALJ credited the testimony of two employees that Challenger was told that they were not going to return to work until it stopped raining, and that when it stopped, they would return. Challenger, however, reported to Brickell only that the men "were not ready to come back to work."

■ Under these circumstances, Brickell and McEver are charged with constructive knowledge of what was said to Challenger. Challenger was a McEver employee acting as a McEver agent in questioning the men. It does not advance the purposes of the Act, nor is it equitable or fair, to require the seven employees to bear the harm or prejudice resulting from the failure of the employer's agent to communicate the reasons given him for the work stoppage. The company appointed Challenger to act as its agent, and it must bear the consequences.

■ Brickell did not discharge the men as soon as he realized they were not returning to work. Instead, he and Steger did some preliminary investigation, through Challenger and by speaking to some other employees, to ascertain the men's reasons. Only after this investiga-

---

2. One employee, Thomas Murray, testified at trial, "We never go to work when it is raining as it was, especially some place that it is too dangerous to work." Transcript at 109. The Board expressly found that "the dangers of working that day as perceived by the employees and the Respondent's project superintendent were not inherent in the job, and the risks attendant to working in those conditions were not assumed by the employees when they accepted employ-

ment with Respondent." *McEver Engineering, Inc.*, 275 N.L.R.B. No. 128, slip op. at 2.

3. McEver's claim is contrary to the ALJ's finding that the rain stopped about 1:30 p.m., when the employees returned to work. We are bound to accept the ALJ's finding for which there is ample support in the record.

tion, however incomplete, were the men fired. Furthermore, Brickell had earlier been put on notice that the employees considered the working conditions to be dangerous—Ray had complained to Brickell that "this is a bunch of bull, working in these kinds of conditions," and Brickell himself had acknowledged the danger when he told Ray that he thought it was "kind of crazy to try to work in that kind of weather." Substantial evidence in the record thus supports the Board's conclusions that before it discharged the men, the company was aware both of the danger of the working conditions and of the connection between fear of that danger and the work stoppage. McEver was on reasonable notice that the seven men were protesting unsafe working conditions, and it was in a position to make an informed judgment as to how to respond. In such circumstances, there is no need for the protesting employees to confront their employer with a "specific demand" for relief from the circumstance precipitating their concerted action. *See, e.g., Diversified Case Co.,* 263 N.L.R.B. 873, 874 (1984). *See also NLRB v. Washington Aluminum Co.,* 370 U.S. 9, 14–15, 82 S.Ct. 1099, 1103, 8 L.Ed.2d 298 (1962) ("The seven employees here were part of a small group of employees who were wholly unorganized. They had no ... representative of any kind to present their grievances to their employer. Under these circumstances, they had to speak for themselves as best they could.... [They had made] more or less spontaneous individual pleas, unsupported by any threat of concerted protest, to which the company apparently gave little consideration and now says the Board should have treated as nothing more than 'the same sort of gripes as the gripes made about the heat in the summertime'").

█ In addition, we note that the facts in this case are in all significant respects identical to those of *NLRB v. Service Machine*

& *Shipbuilding Corp.,* 662 F.2d 1125 (5th Cir.1981) and *Brown & Root, Inc. v. NLRB,* 634 F.2d 816 (5th Cir.1981). In both of those cases, as here, a group of employees together refused to work with electrical equipment while outside in the driving rain. In both of those cases, as here, the employees had in the past worked outside during drizzling or light rain. And in both of those cases we held, as we do here, that the employees' short-term refusal to work in such perceived dangerous conditions is protected activity, and therefore the employer violated section 8(a)(1) when it discharged those employees for participating in that work stoppage.

Finally, McEver urges us to hold that the Board erred by not specifically applying the standard articulated in its recent decision, *Meyers Industries, Inc.,* 268 N.L.R.B. 493 (1984). The Board in *Meyers* adopted a new definition of concerted activities. Under the test enunciated there, an employee's conduct is not "concerted activity" unless it is "engaged in with or on the authority of other employees." The Board went on to say,

once the activity is found to be concerted, an 8(a)(1) violation will be found if, in addition, the employer knew of the protected nature of the employee's activity, the concerted activity was protected by the Act, and the adverse employment action at issue (*e.g.,* discharge) was motivated by the employee's protected concerted activity.

*Meyers,* 268 N.L.R.B. at 497. McEver argues that all of the *Meyers* elements have not been established, and that we therefore must vacate the Board's order.

We find that the Board's *Meyers* standard, if even applicable here, presents no barrier to our affirming the Board's finding that the seven employees were discharged for having engaged in protected, concerted activity.[4] Certainly the work

---

4. We note that *Meyers* was vacated and remanded by the District of Columbia Circuit in February 1985. *Prill v. NLRB,* 755 F.2d 941 (D.C.Cir.), *cert. denied, sub nom Meyer's Industries, Inc. v. Prill,* —— U.S. ——, 106 S.Ct. 313, 88 L.Ed.2d 294, and —— U.S. ——, 106 S.Ct. 352, 88 L.Ed.2d 320 (1985). The Board has continued to use its *Meyers* standard when deciding whether or not an employee action is concerted and protected by the Act. *See, e.g., Daniel International Corp.,*

stoppage was a concerted action, having been undertaken by several employees who acted together after discussing among themselves their common grievance. We have already discussed the question whether "the employer knew of the protected nature of the employees['] activity" in the light of Fifth Circuit case law; substantial evidence in the record supports the ALJ's finding that McEver knew of both the risk inherent in the working conditions and the men's safety-related reasons for temporarily refusing to work. Finally, even McEver admits that the discharges were motivated by the employees' work stoppage, the protected activity involved in this case.[5] Thus, although the Board did not expressly mention *Meyers* in its memorandum decision and order, its finding that the men exercised their section 7 rights in concert is not inconsistent with the requirements of *Meyers*.

### IV.

 Section 2(11) of the Act defines a supervisor as

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). Because the statute is written in the disjunctive, an individual who has the authority to use independent judgment in the execution or effective recommendation of any of the listed functions is

a statutory supervisor. *Abilene Sheet Metal, Inc. v. NLRB*, 619 F.2d 332, 343 (5th Cir.1980); *Hydro Conduit Corp.*, 254 N.L.R.B. 433, 436 (1981). Because section 7 rights are granted only to "employees," statutory supervisors are not covered by the Act.

McEver claims that the ALJ's finding that Preston Ray was not a statutory supervisor is not supported by substantial evidence in the record as a whole. Specifically, McEver claims that Ray received a higher rate of pay than the other crew members; that Ray made work assignments after consultation with the superintendent, similar to the modus operandi of McEver supervisors; that Ray attended weekly management planning meetings; that Ray was consulted by management on layoff decisions and occasionally was present at job applicant interviews; and that Ray shared office space with an office manager.

There is no doubt that at one time Preston Ray was a supervisor at McEver. In 1981, after approximately six months of working as a fitter, Ray was made foreman of the construction crew. The ALJ found that he remained in that position until the spring of 1982, when a series of layoffs reduced the crew from approximately forty-five to eleven employees. At that time, Ray was reduced to the position of working foreman, the equivalent of a leadman's position. Approximately eight weeks before his termination, Ray was told by Steger that he was to be "working with the hands [crew members], just like one of the hands."

The ALJ found that Ray never hired or fired any employee. Like the crew members, Ray was paid by the hour, and had no

---

277 N.L.R.B. No. 81, 120 L.R.R.M. 1289 (1985); *Squier Distributing Co.*, 276 N.L.R.B. No. 133, 120 L.R.R.M. 1155 (1985); *Churchill's Restaurant*, 276 N.L.R.B. No. 87, 120 L.R.R.M. 1233 (1985). We express no opinion as to whether the Fifth Circuit, if presented with the precise issue in the future, will apply the *Meyers* standard in order to define protected concerted activity.

5. *See Daniel International Corp.*, 277 N.L.R.B. No. 81, 120 L.R.R.M. 1289 (1985) ("we find that the employees' spontaneous refusal to work for one day in protest of unique and adverse working conditions ... is protected by the Act.... Such a single concerted walkout is presumptively protected, absent evidence that the work stoppage is part of a plan or pattern of intermittent action inconsistent with a genuine withholding of services or strike....").

privileges or benefits that were not accorded to them as well. He received pay for overtime work, and spent ninety percent of his time performing manual work alongside the crew members. His hourly rate was about twenty-five cents more than that of the next classification below his, a difference common in a leadman situation. He did not assign overtime, recommend pay increases, grant time off, or discipline the employees. He reviewed job assignment lists with Brickell after Steger had indicated what jobs he wanted done; Ray then assigned the men to the various jobs, "depending on whether it called for a welder or a fitter or a helper or so forth." Transcript at 129. The ALJ found that this was a routine matter for Ray, not involving the exercise of independent judgment; he simply divided the available men among the various jobs that he had been told needed to be done that day. The job assignments he made were frequently changed by Steger.

Although prior to a layoff Brickell occasionally asked Ray if he had any disagreements with the decision who was to be laid off, the ALJ found that the one time that Ray did disagree with Brickell, his recommendation was rejected. It is also telling to note that despite Ray's repeated, albeit informal, recommendations on October 21 that because of the unsafe conditions he and the other crew members not continue to work on the tanks in the rain, he and the others were ordered to resume their positions.

As an appellate court, we generally give special deference to a Board finding of supervisory status because the Board is best able to determine the various gradations of authority within the workplace. *Abilene Sheet Metal*, 619 F.2d at 344. Substantial evidence supports the Board's finding that, in view of the indicia of supervisory status reviewed above, Ray was not a supervisor.

## V.

We now turn to McEver's contention that the Board erred in ordering reinstatement for two of the employees despite their alleged misconduct immediately after being fired. Kevin Morgan and Preston Ray were involved in unrelated confrontations with a McEver official and with a Texas Lime official, respectively. The ALJ found that when Morgan was told of his discharge, he angrily questioned Steger about safety shoes and an expected pay raise, threatening to assault Steger unless given a reply. When Steger calmly answered Morgan,[6] Morgan left. The ALJ also found that while Ray was loading his truck preparing to leave the premises after being discharged, Texas Lime official James Thompson approached Ray, ordered him to leave, and threatened to call the police. Steger testified that Ray responded by once shoving away Thompson and threatening to put him in the hospital. A vice president of Texas Lime, however, characterized the incident as "some verbal exchange between Jim and Preston. Preston made some threatening gestures and additional heated conversation occurred. Jim backed away. They both kind of backed off at that point. . . ." When asked on direct examination if anything else had occurred, the Texas Lime official said, "Nothing really of significance, I think."

The ALJ ordered reinstatement for all of the discriminatees, including Ray and Morgan. In the absence of any exceptions by McEver to this ruling, the Board affirmed the ALJ's order. *See McEver Engineering, Inc.*, 275 N.L.R.B. No. 128, slip op. at 1, n. 1. McEver now raises for the first time on appeal its claim that the reinstatement order is inappropriate as to Morgan and Ray. We find that because the issue was not raised during the proceedings before the Board and because the Board expressly did not consider the issue, judicial review is barred by section 10(e) of the Act. *Woelke & Romero Framing, Inc. v.*

---

**6.** Steger testified that he told Morgan, "Cotton, if you will shut up, I will give you an answer," and reminded him of the wage freeze then in effect at McEver. The ALJ found that to be the end of the incident.

**644**

*NLRB*, 456 U.S. 645, 665–66, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398 (1982).[7]

ENFORCEMENT GRANTED.

---

**7.** 29 U.S.C. § 160(e) provides in relevant part: No objection that has not been urged before the board ... shall be considered by the court unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.