**REEF INDUSTRIES, INC., Petitioner and Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent and Cross–Petitioner.**

No. 91–4084

Summary Calendar.

United States Court of Appeals, Fifth Circuit.

Dec. 6, 1991.

---

Kerry E. Notestine, Michelle Hoogendam, Bracewell & Patterson, Houston, Tex., for petitioner and cross-respondent.

Aileen A. Armstrong, Deputy Assoc. Gen. Counsel, Judith Flower, Collis S. Stocking, Magdalena Revuelta, N.L.R.B., Washington, D.C., for respondent and cross-petitioner.

Before JONES, DUHÉ, and WIENER, Circuit Judges.

PER CURIAM:

The National Labor Relations Board (the Board) seeks enforcement of its order that Reef Industries, Inc. (Reef), violated § 8(a)(1) of the National Labor Relations Act (NLRA), when it discharged employee Mark Dillard. The Board found that the acts for which Dillard was fired were "concerted activities" protected under NLRA § 7. Reef cross-petitions to set aside the Board's order, contending that (1) the Board's factual conclusion that Reef knew that the activities were concerted was not supported by substantial evidence in the record, and (2) the Board erred as a matter of law when it found Dillard's activities to be protected under NLRA § 7. We enforce the Board's order.

## I. FACTS AND PROCEDURAL HISTORY

Reef is a plastics manufacturing and fabricating company with facilities in Houston and San Benito, Texas. In July 1989, the Amalgamated Clothing and Textile Workers Union (the Union) began an organizing campaign at the San Benito plant. Reef's personnel manager, Diane Schulz,[1] who is located at the Houston facility, attended meetings at the San Benito plant before the election, and talked with employees about their union activities.

The Union won the election by a slim margin. Reef filed objections to the election, alleging that the Union's misconduct required that it be invalidated. An Administrative Law Judge (ALJ) held an unfair labor practices hearing on Reef's objections.[2] Schulz was Reef's representative at that hearing, and testified that there had been confusion in the voting area during the election. The Union, on cross-examination, asked the Reef employee who had been management's observer at the election if he had graduated from high school. Presumably, the Union's question was intended to demonstrate that Reef's employee-observer was not sufficiently educated to handle the confusion in the voting area. The employee replied that he attended the twelfth grade but did not graduate from high school. Reef's attorney then asked Schulz about the average education level of San Benito employees, explaining, after the Union objected to this question, that its purpose was to show that its employee-observer was more educated than most plant employees. Schulz replied that the Reef employees had an average education level of tenth grade.

Dillard, a warehouseman at the San Benito facility, was at the unfair labor practices hearing as a witness for the Union, and,

---

1. We adopt Reef's spelling of its personnel manager's name.

2. The record does not include either the result of the unfair labor practices hearing or the date on which that result was reached. ·

along with a number of other employees, was waiting outside the hearing room when Schulz testified. During a break in the hearing, an employee who was in the hearing room during Schulz's testimony came out and reported to the employees waiting outside that Schulz had testified that they had an average education level of tenth grade. Unfortunately, that employee neglected to report the context of Schulz's statement or explain that it was the Union, not Reef, which first broached the issue of education. Believing that Schulz's statement was meant to suggest that the employees lacked sufficient education to decide whether or not to have a union, and was another example of what they perceived to be Reef's policy of treating its employees like children, Dillard and the others were shocked, angry, and, according to Dillard's testimony, "very disappointed and insulted" by Schulz's statement.

Apparently, word of Schulz's allegedly insulting statement spread among the San Benito employees. A few days after the hearing, at the suggestion of another employee, Dillard was approached by Trevino, a shipping clerk at San Benito, and asked to prepare a cartoon to be placed on a tee-shirt and sent to Schulz. Dillard was known to be a cartoonist, having previously drawn and distributed cartoons in the plant. Dillard agreed to prepare a cartoon, and he and Trevino drafted a letter to send with the tee-shirt. That evening, Dillard continued to work on the letter and prepared the tee-shirt with a cartoon.

The next day, Dillard and Trevino made a copy of the cartoon on the tee-shirt, and showed this and the letter to other employees in the San Benito plant. The other employees approved their efforts, expressing their satisfaction that something was being done to show Schulz that they were insulted. These employees agreed that the tee-shirt and letter should be sent to Schulz in Houston. Trevino testified that the purpose of the letter was "to see if she [Schulz] could take an insult the way we felt insulted," but that he and Dillard took care to exclude "bad words or any really derogatory statements." Dillard gave the tee-shirt and letter to Trevino in a box addressed to Schulz. Trevino, in turn, gave the box to a truck driver going to Houston. Later, copies of the cartoon were posted on the San Benito employee bulletin board, slipped under the San Benito plant manager's door, and telecopied to employees at the Houston office. Like the rumor about Schulz's statement, news of the employees' action spread rapidly throughout the plant.

Dillard's cartoon depicts a head-scratching, cross-eyed, individual with duck-like features, apparently intended to suggest low intelligence. Above and below this figure, with an occasional backward-written letter, is the message: "Don't ask me! Duh I Dunno? I've got a 10th Grade Edukation." The legend "MAD ODSCENES (c) '89" and the initials MAD also appear on the cartoon. The employees' letter reads as follows (spelling and grammatical errors were in the original):

Dearest Diane,

We here at REEF appreciate your comment made at the hearing October 11, 1989, on behalf of our mentality. As a result of such a flattering, unbiased statement. We here at REEF feel it is in order to present you with this token of our esteem graditude.

We hope you value it and cheerish it, as much as we value your opinion of us.

It is apparent that you hold us in you highest thoughts.

Sincerely,

S.B. REEF EMPLOYEES

P.S. Flattery will get you no where!

Schulz testified that she was shocked by the cartoon and letter and considered that they were intended to ridicule and "put-down" management. She believed the incident discredited her ability to supervise and manage. Schulz testified that she assumed that Dillard sent the letter because it accompanied the tee-shirt containing his initials. Schulz also stated that although she first believed that employees other than Dillard were involved, her initial impression was later rebutted by her investigation and

the investigation of the San Benito plant manager.[3]

Schulz telephoned the San Benito plant manager and asked him to fax her other cartoons containing the initials MAD. Schulz testified that she asked the plant manager to talk with other employees to determine who was involved. The plant manager testified that he asked two shift supervisors if they knew whether other employees were involved, and that the shift supervisors responded that they did not. Other than Dillard, the plant manager did not speak with any non-managerial employees. Schulz also testified that she asked two personnel employees at the San Benito facility if they knew the identity of employees other than Dillard who were involved in the incident, and requested that these employees help her uncover other information. According to Schulz, one of the employees later reported that both personnel employees "knew nothing." Schulz testified that, in light of the negative results of this investigation, she no longer believed that anyone other than Dillard was involved in the incident.

The plant manager telecopied Dillard's other cartoons to Schulz. Upon receiving them, Schulz compared the initials on them with those on the cartoon she received and on the tee-shirt, and concluded that all initials were the same. After consulting with Reef's president, Schulz instructed the plant manager to talk with Dillard and to terminate him if he admitted authorship of the items sent to her. At that point, the plant manager prepared a notice terminating Dillard immediately for insubordination.

Dillard was called into the plant manager's office. The plant manager and Dillard give somewhat different accounts of what transpired at this meeting. The plant manager testified that Dillard admitted authorship of both items, acknowledged sending them to Schulz, and stated that no other employees were involved. The plant manager also stated that, when asked, Dillard denied that Trevino was involved. The plant manager explained that he was told by Dillard that the items were just a joke, and that Dillard wanted to get into making tee-shirts and intended to elicit Schulz's opinion of his handiwork. Although he had suspected that Trevino was involved in the incident, the plant manager testified that he no longer thought so after Dillard admitted authorship of the items.

Dillard testified, on the other hand, that while he admitted making the tee-shirt, he just shook his head when asked if he had seen the letter. Dillard explained that he did not give a direct answer because Trevino was involved and Dillard did not feel as though he had to explain anything to the plant manager at that time. Dillard also testified that the plant manager did not ask if other employees were involved in the incident. Both Dillard and the plant manager agree, however, that the meeting closed with Dillard's discharge for insubordination.

The Union brought an unfair labor practices claim against Reef alleging that Reef violated NLRA § 8(a)(1)–(3) when it fired Dillard. After investigating the Union's charge, the Board's General Counsel filed a complaint asserting that Reef violated NLRA § 8(a)(1).[4] After a hearing, the ALJ concluded that Dillard's actions were "concerted activities" because Dillard prepared and shipped the letter and tee-shirt with, and on the authority of, other employees. The ALJ also found that Reef knew of the concerted nature of Dillard's activities. The ALJ rejected Reef's assertion that although it assumed initially that more than one employee was involved in the incident, because of its investigation it later believed that only Dillard was involved. The ALJ, not mincing words, found Reef's investiga-

---

**3.** Schulz testified on cross-examination that it was "reasonable" to believe that more than one employee was involved in the incident because of the letter's wording. She also testified on cross-examination that the letter's wording was the reason she investigated whether other employees were involved.

**4.** The Union withdrew its claims under NLRA § 8(a)(1)–(3) after the General Counsel issued its complaint.

tion to be a "sham." He reasoned that it was improbable that two shift supervisors "knew nothing" in light of considerable testimony that the supervisors "knew what was going on at the plant." Concluding that Schulz's testimony about her discussions with the two personnel employees had "no probative weight," the ALJ also found that there was insufficient evidence to find that Reef had asked any employee other than Dillard about the incident. The ALJ refused to credit the plant manager's testimony concerning his meeting with Dillard, and found instead that Dillard did not admit authorship of the items.[5] The ALJ explained that Dillard's account of the exit interview—and his stated desire to protect Trevino—was more realistic than the plant manager's account. The ALJ stated that "Dillard's demeanor on the witness stand was that of a truthful witness."

Next, the ALJ concluded that the concerted activities were protected because they were part of, and related to, the ongoing labor dispute with Reef; specifically, the employees were responding to what they thought was an insulting statement from Reef management at the unfair labor practices hearing. The ALJ determined that the employees' concerted action was not so "offensive, vulgar, defamatory, or opprobrious" that it lost its protected status. Finally, as Reef terminated Dillard because of his concerted and protected activities, the ALJ held that Reef violated NLRA § 8(a)(1). The ALJ proposed that Reef be ordered to cease and desist from its unlawful conduct, to reinstate Dillard, and to take other remedial steps.

Reef appealed the ALJ's proposed order to the Board. After clarifying that Dillard's activities were protected because they were part of, and related to, an ongoing union dispute,[6] the Board affirmed the ALJ's factual and legal conclusions and adopted his order. Reef then petitioned this court for review of the Board's order, and the Board cross-petitioned for its enforcement.

## II. ANALYSIS

### A. PRINCIPLES OF LAW

 NLRA § 7 guarantees employees the right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection."[7] NLRA § 8(a)(1) implements that guarantee by making it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees" who exercise their rights under NLRA § 7.[8] Therefore, the threshold question under NLRA § 7 is whether an employee's activity is "concerted." The Board determined that an employee's activity is concerted if it is "engaged in with or on the authority of other employees, and not solely by and on behalf of the employee himself."[9] Once an activity is found to be concerted under NLRA § 7,[10] an adverse employment action violates NLRA § 8(a)(1) if (1) the employer *knew* of the concerted nature of the employee's activity; (2) the concerted action was *protected* under the NLRA § 7; and (3) the employer's adverse action was *because of,* or motivated by, the protected,

---

**5.** As Reef points out, this element of the ALJ's factual findings is incorrect. The record shows that Dillard testified that he admitted that he had authored the tee-shirt but gave a non-committal response when asked if he authored the letter.

**6.** Specifically, the Board found "it unnecessary to pass on the [ALJ's] finding that the letter and cartoon themselves 'were part of an employee attempt to get the Respondent to accept the election results,' since the letter and cartoon were a part of, and related to, the ongoing labor dispute."

**7.** 29 U.S.C. § 157.

**8.** 29 U.S.C. § 158(a)(1).

**9.** *Meyers Industries, Inc.,* 268 NLRB 493, 497 (1984), remanded sub nom., *Prill v. NLRB,* 755 F.2d 941 (D.C.Cir.1985), cert. denied, 474 U.S. 948, 106 S.Ct. 313, 88 L.Ed.2d 294 (1985) (*Meyers I*), on remand, *Meyers Industries, Inc.,* 281 NLRB 882 (1986), enforced sub nom., *Prill v. NLRB,* 835 F.2d 1481 (D.C.Cir.1987), cert. denied, 487 U.S. 1205, 108 S.Ct. 2847, 101 L.Ed.2d 884 (1988) (*Meyers II*).

**10.** Reef does not dispute that Dillard's activities were concerted under NLRA § 7.

concerted activity.[11] Imposition of an adverse employment action on an employee who engages in concerted, protected activities may violate NLRA § 8(a)(1) even if the employer has not exhibited anti-union animus.[12] "As long as the activities engaged in are lawful and the character of the conduct is not indefensible in its context, employees are protected by section 7 of the Act." [13]

## B. QUESTIONS OF FACT

■ Reef challenges the Board's factual finding that Reef knew of the concerted nature of Dillard's activities. Reef argues that the ALJ should have accepted its evidence that it investigated the involvement of other employees and concluded reasonably that there was none. The difficulty with this argument, however, is that almost all testimony favoring Reef's claim that it did not know of the concerted nature of Dillard's activity was not credited by the ALJ. Specifically, the ALJ refused to credit the plant manager's testimony that he asked Dillard about the involvement of others, instead finding Dillard's testimony that the plant manager did not ask about the involvement of others to be more credible. The ALJ also found that Schulz's testimony concerning her investigation into the involvement of others had *no* probative weight because her discussion with the two personnel employees was hearsay, and because Schulz did not ask for the names of the employees with whom the personnel employees spoke. In fact, as noted earlier, the ALJ called Reef's investigation a sham.

■ Nevertheless, Reef argues that because Dillard's testimony contained several "contradictions," the ALJ's determination that Dillard was the more credible witness was error. We cannot agree with that

conclusion. When a credibility choice is involved, the ALJ's conclusion, as adopted by the Board, is entitled to special deference, unless it is based on inadequate reasons, or no reasons.[14] In this case, moreover, we have read the record and do not find the statements that Reef asserts to be contradictions in Dillard's testimony were contradictions at all.

Reef points to two contradictions. First, Reef claims that Dillard's testimony that Schulz's statement insulted him because he has more than a tenth grade education contradicted Dillard's testimony at an earlier hearing before the Texas Employment Commission that he was insulted because he felt that Schulz was comparing him and the other employees to "blacks and mental retards." This is not an accurate characterization of what Dillard said at the earlier hearing, however. The record shows that at that hearing Dillard compared the inappropriateness of Schulz's insulting remarks about Reef employees' low education level to the inappropriateness of commenting on "blacks or mental retards." Second, Reef claims that Dillard contradicted himself when he testified he was not aware that insubordination could result in termination but testified at the earlier hearing that horseplay or rulebreaking could result in termination. It is obvious from the record that Dillard simply misunderstood what was meant by insubordination. We hardly think this sort of semantic error is sufficient to reverse the ALJ's credibility determination.

Neither do we find in the record any basis for disturbing the ALJ's conclusion that the testimony of Schulz and the plant manager was not credible. "When the issue is simply one of believability, we will not overturn the decision of the ALJ, who

**11.** *Meyers I,* 268 NLRB at 497. Also see *NLRB v. McEver Engineering, Inc.,* 784 F.2d 634, 640 (5th Cir.1986) ("Before an employer can be held to have discriminated against its employees for their protected activity, the Board must show that the supervisor responsible for the alleged discriminatory action knew about the protected activity, and that the employees' protected activity was a motivating factor in the employer's decision."), citing *Air Surrey Corp. v. NLRB,* 601 F.2d 256, 257–58 (6th Cir.1979).

**12.** *NLRB v. Florida Medical Center, Inc.,* 576 F.2d 666, 672 (5th Cir.1978), citing *Crown Central Petroleum Corp. v. NLRB,* 430 F.2d 724 (5th Cir.1970).

**13.** Id.

**14.** *NLRB v. Moore Business Forms, Inc.,* 574 F.2d 835, 843 (5th Cir.1978).

had the opportunity to hear the testimony and view the witnesses, unless his findings are self-contradictory."[15] In this case, we have no reason to overturn the ALJ's credibility determinations.

Were we deciding *de novo* whether Reef knew that Dillard's activities were concerted, we might arrive at a different result.[16] But our task on review is limited to ensuring that the Board's approbation of the ALJ's factual conclusion that Reef knew of the concerted nature of Dillard's activities is reasonable and supported by substantial evidence on the record as a whole.[17] We find that it is, and therefore affirm the Board's factual finding on the question of knowledge.

## C. QUESTIONS OF LAW

### 1. Protected Activities

 Reef contends that the Board was wrong to conclude, as a matter of law, that Dillard's action in sending the tee-shirt and letter was a protected activity. Although employees' concerted activities are protected if they are part of an on-going labor dispute,[18] the employees' rights are not absolute; they must be balanced against the employer's long-recognized right to maintain order and respect. The Board has determined that employees' concerted activity is not protected under NLRA § 7 when it is "so flagrant, violent, or extreme as to render [the employees] unfit for service."[19] The Board makes this determination by looking at all the facts in a particu-

lar case.[20] The law is clear, however, that disciplining an employee for insubordination may violate § 8(a)(1), if the disciplinary action is because of the employee's protected activity.[21]

 Reef argues that Dillard's activities were unprotected because they were premeditated, flagrantly insubordinate, and intended only to insult Schulz. Reef notes that Dillard's activities were in defiance of its managerial authority and could have resulted in the breakdown of plant discipline. The Board, on the other hand, characterizes Dillard's action as a mildly sarcastic response to what the employees understood to be the reason for Schulz's statements.

We find that the Board's conclusion that the letter and tee-shirt were not so offensive as to lose their protection under NLRA § 7 is reasonable and consistent with its prior holdings.[22] Clearly, the statements on the tee-shirt and in the letter are not fraught with malice, obscene, violent, extreme, or wholly unjustified. Indeed, the essential mildness of these statements is best demonstrated by contrasting it to the situation in *Caterpillar Tractor Co.*,[23] in which the Board found unprotected an employee-drawn cartoon depicting an actual supervisor as engaging in excretory functions (with clearly-defined male genitals) while uttering obscenities. Neither do we find the Board unreasonable in concluding that the activity in the instant case was not as egregious, or ultimately as harmful to

---

**15.** *Florida Medical Center, Inc.,* 576 F.2d at 671.

**16.** See, e.g., *Dow Chemical Co., Texas Div. v. NLRB,* 660 F.2d 637, 643 (5th Cir.1981) ("When the board's findings are reasonable and supported by substantial evidence, a court will affirm them, though the court might well have made contrary findings if sitting *de novo*.").

**17.** *Baker Mfg. Co. v. NLRB,* 759 F.2d 1219, 1223 (5th Cir.1985), citing *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and 29 U.S.C. § 160(f), NLRA § 10(f).

**18.** *Allied Aviation Service Company of New Jersey, Inc.,* 248 NLRB 229, 231 (1980).

**19.** *Dreis & Krump Mfg. Co., Inc.,* 221 NLRB 309, 315 (1975), enforced, 544 F.2d 320 (7th Cir. 1976). Also see, e.g., *Ben Pekin Corp.,* 181

NLRB 1025 (1970) ("so offensive, defamatory or opprobrious"), enforced, 452 F.2d 205 (7th Cir. 1971); *Jacobs Transfer, Inc.,* 201 NLRB 210 (1973) ("deliberately and maliciously false"); and *Caterpillar Tractor Co.,* 276 NLRB 1323 (1985) ("so egregious").

**20.** *Florida Medical Center, Inc.,* 576 F.2d at 673.

**21.** *Id.*

**22.** *Baker Mfg. Co.,* 759 F.2d at 1223, citing *Central Florida Sheet Metal v. NLRB,* 664 F.2d 489, 496 (5th Cir.1981).

**23.** 276 NLRB 1323 (1985). The Board described the cartoon as "malicious, defamatory, insubordinate, obnoxious, and wholly unjustified." *Id.* at 1326.

Reef's business, as cases, such as *American Arbitration Ass'n*,[24] which involve employee protests to third parties.

■ Reef contends, however, that this court's previous decision in *Boaz Spinning Co. v. NLRB*,[25] requires the Board to consider the distinction between premeditated and spontaneous statements. We agree with Reef that the Board should consider all the distinctive facts of each case, including whether an employee's actions are spontaneous or premeditated. But nothing in the record suggests to us that the Board did not do so in this case. Reef acknowledges, moreover, that nothing in our earlier cases *requires*, as a matter of law, that an employee's conduct be spontaneous to be protected under NLRA § 7.

Next, Reef challenges the Board's conclusion that Dillard's actions "were part of, and related to, an ongoing labor dispute," arguing instead that "Dillard's conduct relates to an isolated event—Schulz's testimony at a Board-conducted hearing—and nothing more." While there is no dispute that the employees' actions were in response to Schulz's testimony, we do not agree with Reef that they should be viewed in isolation. There is sufficient evidence in the record to support the Board's conclusion that the employees viewed Schulz's offending statement concerning their education level in the context of Reef's treatment of its employees before and during the election campaign. For example, Dillard testified on cross-examination that the employees thought that Schulz meant that Reef's employees were too uneducated to decide whether or not a union was appropriate. Another Reef employee similarly testified that the employees saw Schulz's statement as confirmation that Reef treated its employees "like children." Furthermore, Schulz's statement was made at an unfair labor practices hearing called by Reef in order to challenge the pro-union results of the recent election. Given all the facts and circumstances, we find that the Board reasonably concluded that the employees' activities related to an on-going labor dispute, which included Reef's challenge of the election results.

Reef also argues that Dillard's activities were not protected because the letter and tee-shirt neither requested that Reef take a particular action nor specifically addressed wages, hours, or working conditions. First, as to the need to demand specific employer action, the Supreme Court implicitly rejected this position in *Eastex v. NLRB*,[26] when it affirmed the Board's determination that statements in a union newsletter urging employees to register to vote and to lobby against the inclusion of a right-to-work provision in the state constitution were protected under the "mutual aid or protection" clause in NLRA § 7. Numerous cases confirm that activities for "mutual aid or protection" under NLRA § 7 are not limited to either the employee's own employer-employee relationship or to activities intended to change specific conditions or terms of employment.[27] There must, of course, be some nexus between the employees' concerted activities and the employment relationship—as the Supreme Court noted in *Eastex*, at some point the relationship between the employees' concerted activity and the employees' interests as employees becomes "so attenuated that an activity cannot fairly be deemed to come within the 'mutual aid or protection' clause."[28] But *Eastex* also holds that the Board is the proper forum "to delineate precisely the boundaries" of the "mutual aid or protection" clause.[29] We find that the Board was reasonable in concluding that the employees' activities were ade-

**24.** 233 NLRB 71 (1977) (finding unprotected a questionnaire sent by an employee to the company's customers that asked, e.g., whether jeans look better on dogs, monkeys, or management).

**25.** 395 F.2d 512 (5th Cir.1968).

**26.** 437 U.S. 556, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978).

**27.** See, e.g., *NLRB v. Southern California Edison Co.*, 646 F.2d 1352, 1364 (9th Cir.1981), citing *Kaiser Engineers v. NLRB*, 538 F.2d 1379, 1384–85 (9th Cir.1976).

**28.** 437 U.S. at 567–68, 98 S.Ct. at 2513–14.

**29.** Id. at 568, 98 S.Ct. at 2514.

quately related to their employment relationship.[30]

Second, as to the content of the employees' protest, in *NLRB v. McEver Engineering, Inc.*, this court explicitly stated that "there is no need for the protesting employees to confront their employer with a 'specific demand' for relief from the circumstances precipitating their concerted action."[31] Here, the Board found that the employees' activities, which were intended to convey their dismay with Schulz's statement and, more generally, with the way Reef treated its employees, might "reasonably be expected to affect terms or conditions of employment."[32] We find the Board's conclusion to be reasonable.

### 2. Discharge Because of Protected Activities

Reef contends that the Board erred in concluding that Dillard was not discharged because of his protected, concerted activity. There is no dispute, however, that Reef terminated Dillard for sending the letter and tee-shirt to Schulz. Therefore, because we have found that Dillard's activities were protected and concerted, and because not even Reef disputes that Dillard was terminated for his insubordination in preparing and sending the tee-shirt and letter, we hold that the Board correctly concluded that Dillard was fired in violation of NLRA § 8(a)(1).

### III. CONCLUSION

For the reasons stated above, we AFFIRM the Board's order and GRANT its petition for enforcement.

---

30. Compare, e.g., *Misericordia Hospital Medical Center v. NLRB,* 623 F.2d 808, 812–14 (2d Cir. 1980) (report critical of hospital's operations constituted a protected activity), with *International Union, United Auto., etc. v. NLRB,* 645 F.2d 1151, 1153–55 (D.C.Cir.1981) (leaflets urging workers to vote for specific candidates were purely political and insufficiently related to their employment conditions to merit protection).

31. 784 F.2d at 641.

32. Id. at 639, citing *Brown & Root, Inc. v. NLRB,* 634 F.2d 816 (5th Cir.1981).